[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 15, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-11518

_____

D.C. Docket No. 02-00585-CR-BBM-1-6

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

ANTHONY GARZA,
SALOMON ALVAREZ,
TIMOTHY MC CLENDON,
JOSE HERNANDEZ TAURINO,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(September 15, 2006)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and JORDAN,[*] District Judge.

PER CURIAM:

_____

[*]Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida, sitting by designation.

Following a one-week trial, a jury convicted Anthony Garza, Salomon Alvarez, and Jose Hernandez Taurino of distributing, or aiding and abetting the distribution of, 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The jury also convicted Mr. Garza of conspiring to possess, with the intent to distribute, 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, and convicted Timothy McClendon of conspiring to possess, with the intent to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Mssrs. Garza, Alvarez, Hernandez Taurino, and McClendon appeal their convictions and/or sentences. We affirm in all relevant respects, but remand so that Mr. Garza's judgment can be corrected to reflect the appropriate offense of conviction.

## I. FACTS

In 1999, the Drug Enforcement Administration ("DEA") received information from confidential sources about drug trafficking activity by Ronald Knight and his associates, and initiated an investigation. The government applied for and received court approval for several Title III wiretaps, including a wiretap on Ronald Knight's telephone beginning on November 30, 2001. The intercepted calls showed that Ronald Knight was a mid-level distributor for a Mexican drug distribution network controlled at least in part by the Garza brothers (who are not related to Anthony Garza). This organization was active in Atlanta, Birmingham, Chicago, Pittsburgh,

2

and Grand Rapids. The conversations intercepted on the wiretaps showed that Ronald Knight communicated directly with the Garza brothers to coordinate the receipt of truckloads of cocaine and marijuana from Texas, and then sold the drugs to Mr. McClendon, Kendell Ivory, and Corey Lewis. At trial, Mr. Lewis and Ronald Knight testified for the government.

In late 2001, Ronald Knight was looking for locations in Atlanta where incoming drug-laden trucks could be covertly unloaded, so Mr. Lewis introduced him to Henry Green, who operated a truck repair facility. Mr. Lewis and Ronald Knight testified that Mr. Green agreed to allow trucks to pull into his repair facility after the business was closed, and unload the drugs from the trucks, in return for payment from Ronald Knight.

The trial evidence centered around two separate shipments of drugs to Ronald Knight from the Garza brothers. The first was a shipment of 89 kilograms of cocaine in November of 2001. The second was a shipment of approximately 1,500 pounds of marijuana on December 5, 2001. We do not discuss the cocaine shipment further because the only defendant convicted of a cocaine charge, Mr. McClendon, does not challenge the sufficiency of the evidence on that charge, and the cocaine shipment is not otherwise relevant to the other issues raised on appeal.

In the days leading up to December 5, 2001, Ronald Knight received a

telephone call from Wilfredo Garza, one of the Garza brothers. Wilfredo Garza advised Ronald Knight that a tractor trailer shipment of marijuana was on its way to Atlanta. Before the marijuana arrived in Atlanta, Wilfredo Garza provided Ronald Knight with a phone number and said the person using this number would coordinate the delivery of the marijuana with him.

On December 5, 2001, Ronald Knight called the number given to him by Wilfredo Garza and arranged to meet with the person who answered at a local hotel to finalize plans for unloading the marijuana. DEA agents monitoring the wiretap of Ronald Knight's telephone overheard this conversation and followed Ronald Knight to the hotel. They watched him park at the hotel and eventually enter a room on the second floor. Ronald Knight explained at trial that, during this meeting, he and two unidentified Hispanic individuals worked out the details of how the truckload of marijuana would be unloaded. Right after Ronald Knight left the hotel, DEA Special Agent McCrorey went to the room Ronald Knight had visited and knocked on the door, pretending to be lost. Agent McCrorey testified that Anthony Garza opened the door to the hotel room. The second Hispanic male in the room was never identified.

In making arrangements for the delivery of the marijuana, Ronald Knight asked Mr. Lewis if they could once again use Mr. Green's repair facility to unload the drugs. Mr. Lewis testified that he consulted Mr. Green, who refused to open up the

4

garage or allow the marijuana to be stored in his shop because he had not received additional payment for storing the earlier shipment of cocaine. Mr. Green, however, agreed to allow Mr. Lewis to use the lot outside his garage, and further agreed to leave his office open and have his employee, Roy Bridges, present to open the gate to the lot to let in the tractor trailer. This conversation between Mr. Lewis and Ronald Knight took place at around 8:15 p.m.

Ronald Knight asked his brother, Byron Knight, to go to the hotel where he had earlier met Anthony Garza and pick up Mr. Garza and the other Hispanic male. Byron Knight testified that he picked up these two men at the hotel and drove them to a truck stop, where two more Hispanic males were waiting with the tractor trailer carrying the marijuana. Byron Knight, Mr. Garza, and the other Hispanic mail from the hotel joined the two other Hispanic males inside the cab of the tractor trailer, and the five of them then rode in the tractor trailer to Mr. Green's lot. When Byron Knight and the four Hispanic males arrived at the lot in the tractor trailer – at around 9:45 p.m. – Mr. Lewis and Mr. Bridges were there to meet them. No one present at the lot at this time identified who the Hispanic males were or gave any descriptions of them.

Because Mr. Green did not allow Mr. Lewis to park the tractor trailer inside the garage, and thus, did not unlock the garage, the Hispanic male who was driving the

5

tractor trailer simply backed up close to the front wall of the building. The four Hispanic males and Byron Knight got out of the truck, and everyone present, including Mr. Lewis and Mr. Bridges, went into the office located inside the building.

While Ronald Knight worked on finding vehicles to transport the marijuana from the lot, some of the Hispanic males obtained a flashlight, entered the trailer, and began off-loading the marijuana, assisted by Mr. Lewis. Mr. Lewis testified that, "from what [he] recall[ed]," "all" of the Hispanic males got into the trailer. Byron Knight testified that only three of the Hispanic males entered the trailer at this time, and that the fourth – the driver – stayed at the back of the trailer with him. While they were together at the back of the trailer, Byron Knight and the driver did not discuss the marijuana. As noted earlier, no one present at the lot identified who these Hispanic males were (or who the driver was), or gave any descriptions of them.

The trailer, which was refrigerated, contained double-stacked pallets of cabbage. The marijuana was stored at the front (or nose) of the trailer so that much of the cabbage had to be removed to get to the drugs. The marijuana was secreted inside produce boxes and wrapped in bundles coated with a greasy substance to mask the smell. When the boxes containing the marijuana were moved from the front of the trailer to the rear, the bundles were taken out of the boxes and stacked up just inside the rear of the trailer. In this way, until Ronald Knight arrived with the off-

6

load vehicles, all activity took place inside the trailer, and the doors of the trailer were kept nearly closed to avoid police detection.

Mr. Lewis testified that, although at times one or more of the Hispanic males would get out of the trailer to get some air, throughout the course of the off-loading each of the Hispanic males spent some time in the trailer. Because the refrigeration unit had been turned off, the walls of the trailer were wet and dripping with water.

In the meantime, Ronald Knight had arranged to borrow a maroon pick-up truck, and at around 10:30 p.m. DEA agents saw him meet the truck at an Amoco gas station and guide the truck to Mr. Green's lot. Mr. Lewis also borrowed a white pick-up truck and brought it to Mr. Green's lot. The parties agreed that they would load the marijuana onto the trucks, and that Mr. Lewis, with the white truck, and Byron Knight, with the maroon truck, would drive to another location.

Testimony at trial, viewed in the light most favorable to the government, established that everyone at the lot – the unidentified Hispanic males, Mr. Lewis, Byron Knight, and Mr. Bridges – loaded the marijuana bundles from the back of the trailer onto the two trucks. Byron Knight, for example, explained that he and the unidentified driver of the tractor trailer helped carry the marijuana bundles from the back of the trailer to the trucks. Byron Knight attempted to cover the marijuana bundles in the maroon truck by placing cardboard boxes from the back of the trailer

on top of the drugs. At 12:19 a.m. on December 6, 2001 – just after midnight – Mr. Lewis called Ronald Knight and informed him that he and Byron Knight were leaving Mr. Green's lot.

The white truck left first, followed closely by the maroon truck. Dekalb County police officers, who were assisting DEA agents that evening, performed a traffic stop of the maroon truck, but Mr. Lewis managed to flee in the white truck. Dekalb County police seized approximately 750 pounds of marijuana from the maroon truck and arrested Byron Knight.

Agent McCrorey testified that, after the maroon truck was stopped, he briefly examined the truck and its contents and observed the 750 pounds of marijuana in the truck's bed partially covered by flattened cabbage boxes. Agent McCrorey then drove into Mr. Green's nearby lot, where he saw a tractor trailer parked in front of the building and Mr. Bridges walking from the back of the trailer to a large green dumpster with empty produce boxes in his hands. Agent McCrorey noticed that the boxes Mr. Bridges was carrying were identical to the boxes he had seen in the bed of Byron Knight's truck. Agent McCrorey then drove out of the lot and called in marked Dekalb County police units.

Dekalb County Officers Brink and Frank, driving a marked car and wearing uniforms, entered defendant Mr. Green's lot. Once there, they saw Mr. Bridges at the

front of the tractor trailer near the cab. When the officers asked him what he was doing in the lot, Mr. Bridges stated he was working on the tractor trailer; however, it was after midnight, there was no lighting in the lot, and Mr. Bridges had no tools in his hands or nearby.

The officers then walked to the rear of the trailer where they found four Hispanic males, who were identified as Mssrs. Garza, Alvarez, Hernandez Taurino, and Rudy Perez.[2] The officers smelled a strong odor of raw, bulk marijuana. One door of the trailer was open and the officers noticed that the shipper's tag – which is used to seal the trailer after it is loaded and locked – had been cut.

The officers asked Mssrs. Garza, Alvarez, Hernandez Taurino, and Perez what they were doing, and they replied that they were "hanging out." The officers performed pat-down searches and noticed that, although it had not rained that evening, the whole front of the clothing worn by Mr. Garza and Mr. Perez was wet. The officers then obtained permission to search the tractor and the trailer from one of the Hispanic males who identified himself as the driver (there was no testimony at trial about which of the four Hispanic males this person was). Inside the trailer, the officers saw crates of produce with many of them appearing to have been trampled upon. In addition, the tops of all the crates were wet. No marijuana was

---

[2]According to the government's brief, Mr. Perez was a fugitive at the time of trial.

found in or near the trailer.

Agent McCrorey searched the cab of the tractor and found the following: (1) a certificate of completion of a truck driving course in Mr. Alvarez's name; (2) a Texas commercial driver's license in Mr. Hernandez Taurino's wallet; and (3) several driver daily logs, used to keep track of the hours driven each day by each driver of the tractor trailer. According to the driver logs, Mr. Alvarez and Mr. Hernandez Taurino drove the tractor trailer from Texas to Georgia, with each one operating the truck for various stages of the trip.

## II. TRIAL ISSUES

### A. THE FAILURE OF THE COURT REPORTER TO TRANSCRIBE THE CALLS AS THEY WERE PLAYED FOR THE JURY

Mr. McClendon, who has new counsel on appeal, argues that reversal is warranted because the court reporter did not transcribe the recorded telephone calls when they were played for the jury, thereby making it impossible (1) for his new counsel to review the record and decide what arguments to make on appeal, and (2) for this Court to undertake appropriate appellate review. Although we agree that the court reporter's failure to transcribe the calls played for the jury was a violation of 28 U.S.C. § 753(b), we reject Mr. McClendon's claim based upon our prior decision in *United States v. Charles,* 313 F.3d 1278, 1282-83 (11th Cir. 2002), because (1) the calls here were in English; (2) the disc with the calls was introduced into evidence as

10

Government Exhibit 1 and is part of the record on appeal; (3) the transcripts of these calls were introduced into evidence as Government Exhibit 2 and are part of the record on appeal; and (4) Ronald Knight and Mr. Lewis, participants in the conversations, testified that the transcripts were accurate. Given that the calls were in English and that the transcripts were accurate, there is not a "substantial and significant omission from the trial transcript," and we have been able to reconstruct the record. As in recent cases involving similar circumstances, reversal is not warranted. *See, e.g., United States v. Wright,* 164 Fed. Appx. 809, 819 (11th Cir. Jan. 6, 2006); *United States v. Payne,* 148 Fed. Appx. 804, 808 (11th Cir. August 29, 2005).

## B. SUFFICIENCY OF THE EVIDENCE

Mssrs. Garza, Alvarez, and Hernandez Taurino contend that there was insufficient evidence to support their convictions. To recap, all three were convicted of distributing, or aiding and abetting the distribution of, 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In addition, Mr. Garza was convicted of conspiracy to possess, with the intent to distribute, 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 846.[3]

We review the sufficiency of the evidence *de novo*, "resolv[ing] all reasonable

---

[3]To the extent Mr. McClendon challenges the sufficiency of the evidence by adopting his co-defendants' arguments, we summarily affirm.

11

inferences in favor of the jury's verdict. The evidence is sufficient so long as a reasonable trier of fact, choosing among reasonable interpretations of the evidence, could find guilt beyond a reasonable doubt." *United States v. Arbane,* 446 F.3d 1223, 1226 n.1 (11th Cir. 2006) (citation and internal quotation marks omitted).

Before turning to the evidence, we summarize the elements of the offenses on which the jury convicted. With respect to the distribution charge under 21 U.S.C. § 841(a)(1), the government had to prove beyond a reasonable doubt (1) that the defendant in question distributed (i.e., transferred or delivered possession of) 100 kilograms or more of marijuana to another, and (2) that the defendant acted knowingly and intentionally. *See, e.g., United States v. Rosen,* 582 F.2d 1032, 1033 (5th Cir. 1978); *United States v. Harold,* 531 F.2d 704, 705 (5th Cir. 1976). On an aiding and abetting theory under 18 U.S.C. § 2, the government had to prove beyond a reasonable doubt (1) that someone committed the offense of distributing 100 kilograms or more of marijuana, (2) that the defendant in question committed an act which contributed to and furthered this offense, and (3) that the defendant intended to aid the commission of the offense. *See, e.g., United States v. Arias-Izquierdo,* 449 F.3d 1168, 1176 (11th Cir. 2006). "Mere presence is . . . insufficient when the government charges the defendant under an aiding and abetting theory." *United States v. Diaz-Boyzo,* 432 F.3d 1264, 1269 (11th Cir. 2005). "To aid and abet one

12

must actively participate in the illegal venture." *Harold,* 531 F.2d at 705. To support a guilty verdict on the conspiracy charge against Mr. Garza under 21 U.S.C. § 846, the government had to prove beyond a reasonable doubt (1) that two or more persons conspired or illegally agreed to possess, with the intent to distribute, 100 kilograms or more of marijuana, (2) that Mr. Garza knew of the goal or objective of the conspiracy, and (3) that, with this knowledge, he voluntarily joined the conspiracy. *See, e.g., United States v. Cruz,* 106 F.3d 1553, 1555-56 (11th Cir. 1997).

### 1. MSSRS. ALVAREZ AND HERNANDEZ TAURINO

The government's case against Mssrs. Alvarez and Hernandez Taurino was not overwhelming, largely because no one present at the lot identified the Hispanic males who helped unload the marijuana from the trailer. Nevertheless, understanding that "suspicion and conjecture are not sufficient to sustain a conviction," *Montoya v. United States,* 402 F.2d 847, 850 (5th Cir. 1968), we conclude that the evidence was sufficient to support the jury's verdict.

First, both men drove the tractor trailer with the 1500 pounds of marijuana from Texas to Georgia. Neither was a mere passenger. *Cf. United States v. Flores,* 564 F.2d 717, 718-19 (5th Cir. 1977) (reversing conviction of passenger of pickup truck containing 175 pounds of marijuana, even though passenger fled from law enforcement, because there was no evidence that marijuana was visible to passenger

13

or that passenger made any inculpatory statements). Our cases hold that driving or operating a vehicle, boat, or aircraft containing a large amount of narcotics is enough for conviction, but where the narcotics are hidden, there must be "circumstances evidencing a consciousness of guilt on the part of the defendant." *United States v. Stanley,* 24 F.3d 1314, 1320 (11th Cir. 1994) (adopting Fifth Circuit standard). Here there were such circumstances. Although the driver log for December 5, 2001, indicated that the tractor trailer "broke" at 9:00 p.m., the men drove the tractor trailer to a lot next to a closed repair facility – remember that Mr. Green had refused to open the garage – late at night with no indication that any repairs were made or that any tools were available for such repairs. Furthermore, when questioned by the officers after midnight on December 6, 2001, as to what they were doing at the lot, Mssrs. Alvarez and Hernandez Taurino (together with Mssrs. Garza and Perez) said they were hanging out. That response was inconsistent with being at the lot for repairs to the tractor trailer, and suspicious given (1) the strong odor of raw marijuana and (2) the fact that the unloading operation had just been completed.

Second, there is the general principle that, in cases involving large amounts of narcotics, "a prudent drug smuggler is not likely to suffer the presence of unaffiliated bystanders." *United States v. Cruz-Valdez,* 773 F.2d 1541, 1547 (11th Cir. 1985) (*en banc*). That principle, by itself, is not enough, but it is not irrelevant either.

14

Third, despite the inability of any witnesses present at the lot to identify or describe the Hispanic males who helped unload the marijuana, the jury could reasonably have found that two of those males were Mssrs. Alvarez and Hernandez Taurino. For starters, the two Hispanic males driving the tractor trailer containing the marijuana met Byron Knight and the two other Hispanic males from the hotel at the truck stop sometime before 9:45 p.m. and then headed to Mr. Green's lot. Since Mssrs. Alvarez and Hernandez Taurino drove the tractor trailer from Texas, and the driver log indicated that the tractor trailer "broke" at 9:00 p.m., the jury could reasonably have found that they were the two in the tractor trailer who met Byron Knight and the other two Hispanic males. In addition, one of the Hispanic males waiting in the tractor trailer identified himself to Byron Knight as the driver, which again supports a finding that the two males waiting in the tractor trailer were Mssrs. Alvarez and Hernandez Taurino. Finally, the whole unloading operation for the 1500 pounds of marijuana took about two to two and a half hours (from around 9:45 p.m. to around 12:15 a.m.), the testimony was that four Hispanic males helped unload the marijuana, and the arresting officers arrived at the lot shortly after the drugs were unloaded. From these facts, the jury could reasonably have found that the four men found near the open trailer by the officers after midnight – including Mssrs. Alvarez and Hernandez Taurino – were the same four men who had helped move the drugs.

15

We have considered the cases cited by Mssrs. Alvarez and Hernandez Taurino, as well as cases similar to them. *See, e.g., United States v. Lopez-Ramirez,* 68 F.3d 438, 441 (11th Cir. 1995) (defendant's mere presence in garage when alleged coconspirator unloaded crate packed with cocaine, and presence in house where police later discovered cocaine, was not sufficient to support convictions for conspiracy or possession with intent to distribute); *United States v. Hernandez,* 896 F.2d 513, 519-20 (11th Cir. 1990) (reversing conspiracy conviction despite being able to "surmise that [the defendant's] association with [another individual] may have been criminal, that [the defendant's] presence at the scene of the crime could have been because of his involvement in the conspiracy, [and] that [the defendant's] abrupt departure might have occurred because he caught on[,] was guilty, and hoped to avoid arrest"); *United States v. Pintado,* 715 F.2d 1501, 1504-05 (11th Cir. 1983) (evidence that defendant was hiding in closet of house where drug raid was conducted at around 1:45 a.m. was insufficient to support conspiracy conviction, even though 29 bales of damp marijuana were found in a car inside an enclosed garage whose door was open, and even though Coast Guard had seen various unidentified individuals run from a boat to the house carrying packages, as damp clothing found in the house was not tied to defendant). We do not find these cases controlling, however, as the facts here are quantitatively and qualitatively different. More on point is *United States v. Mietus,*

16

237 F.3d 866, 873 (7ᵗʰ Cir. 2001), which upheld the conviction of a defendant who drove a tractor-trailer to a garage, called other co-defendants to come to the garage, and was found unloading boxes of marijuana concealed in the trailer load of fresh produce. *Mietus* is not on "all fours," because the defendant there made calls to others and was arrested while unloading the drugs, but it is analogous because, as we have noted above, the jury could reasonably have found that Mssrs. Alvarez and Hernandez Taurino were two of the Hispanic males who helped unload the marijuana at Mr. Green's lot.

## 2. MR. GARZA

As to Mr. Garza, we also find the evidence sufficient on both counts of conviction. First, the jury could reasonably have found that Byron Knight met Mr. Garza at the hotel and discussed with him how the marijuana would be unloaded, that Mr. Garza was one of the two Hispanic males driven by Byron Knight to the truck stop to meet Mssrs. Alvarez and Hernandez Taurino, and that Mr. Garza then traveled in the tractor trailer to Mr. Green's lot. This evidence, by itself, shows Mr. Garza's knowledge and is sufficient to sustain the conspiracy conviction. *See, e.g., Hernandez,* 896 F.2d at 518-19 (upholding conspiracy conviction of defendant who checked her phone to see if cocaine deal would go through and who offered to conduct transaction at her house if it could not be completed as planned). Second, at

the time of Mr. Garza's arrest, the whole front of his clothing was wet (as was the front of Mr. Perez's clothing). The jury could reasonably have found that Mr. Garza had been inside the trailer, whose walls were dripping with water because the refrigeration unit had been turned off, and that he had been inside the trailer to help unload the marijuana. Third, when asked by the officers what he was doing at Mr. Green's lot after midnight – having no other known connection to the tractor trailer or the lot – Mr. Garza said he was hanging out. This evidence, taken together with the earlier discussion Byron Knight had with Mr. Garza, supports the distribution conviction.

## III. SENTENCING ISSUES

We review the district court's application and interpretation of the Sentencing Guidelines *de novo*. *See e.g.*, *United States v. Norris*, 452 F.3d 1275, 1280 (11th Cir. 2006). The district court's role assessment under U.S.S.G. § 3B1.2 is reviewed for clear error. *See United States v. Rodriguez De Varon*, 175 F.3d 930, 937 (11th Cir. 1999) (*en banc*).

## A. MR. MCCLENDON

Mr. McClendon argues that the district court erred in not awarding him a minor role reduction under USSG § 3B1.2. We disagree. The district court held Mr. McClendon accountable only for the nine kilograms of cocaine that he agreed to sell,

18

and not for the entire shipment of 89 kilograms. This limitation of relevant conduct does not bar a minor role reduction as a matter of law, *see* § 3B1.2,comment. (n. 3(a)), but it is not irrelevant either, as explained in *United States v. Boyd,* 291 F.3d 1274, 1277 (11th Cir. 2002), because the district court must measure a defendant's conduct against the role of others in that relevant conduct. The district court did not clearly err in finding that Mr. McClendon was not a minor participant. Unlike some of the other conspirators, Mr. McClendon had an ownership interest in a portion of the cocaine shipment, and agreed to further distribute some of the cocaine; he was not "substantially less culpable than the average participant." § 3B1.2, comment (n. 3(a)).[4]

Mr. McClendon further contends that, in calculating his criminal history, the district court erred in counting a Georgia misdemeanor conviction for obstruction of a police officer and a Georgia misdemeanor conviction for simple battery. Again, we disagree.

Looking at the obstruction conviction first, Mr. McClendon was sentenced in 2000 to 10 days' imprisonment and 12 months' probation. *See* McClendon PSR ¶ 29. In relevant part, USSG § 4A1.2( c)(1)(A) provides that a misdemeanor conviction for

---

[4]Mr. Garza sought to adopt the arguments made by his co-defendants, including the minor role argument asserted by Mr. McClendon. We do not address Mr. Garza's entitlement to a minor role, as that matter is heavily dependent on the facts and those facts are not addressed by Mr. Garza in his brief.

an offense similar to "hindering or failure to obey a police officer" is counted if the "sentence was a term of probation of at least one year or a term of imprisonment of at least 30 days[.]" Mr. McClendon, citing to *Billingsley v. State,* 177 Ga. App. 775, 341 S.E. 2d 305 (Ga. App. 1997) (holding that "twelve months" is not equivalent to "one year" for purposes of a misdemeanor), argues that "Georgia law makes a critical distinction between sentences of 'twelve months' and sentences of 'one year.' A misdemeanor cannot be punished by a period of time exceeding twelve months, and Georgia law holds that one year is greater than twelve months." McClendon Brief at 22. Like the other circuits which have addressed this argument, we reject it because Mr. McClendon has cited no authorities to support his contention that the Sentencing Guidelines – as opposed to Georgia law – view a probationary sentence of "twelve months" as different than a probationary sentence of "one year." *See United States v. Blevins,* 29 Fed. Appx. 195, 197 (6th Cir. Dec. 28, 2001); *United States v. Mattox,* 1998 WL 808362, *4 (4th Cir. Nov. 23, 1998); *United States v. Prosper,* 1998 WL 767105, *1-*2 (8th Cir. Nov. 2, 1998). *See also United States v. McClendon,* 195 F.3d 598, 602-03 (11th Cir. 1999) (rejecting similar argument on plain error review).

With respect to the simple battery conviction, Mr. McClendon was sentenced in 1992 to 12 months' probation and a $360 fine. Mr. McClendon asserts that a simple battery conviction is not counted under the Sentencing Guidelines, but the

language of § 4A1.2( c) does not support his argument. Under this provision, "sentences for misdemeanor and petty offenses are counted, except as follows . . . . " Nothing following this language – i.e., nothing in subsections ( c)(1) or ( c)(2) – suggests that a simple battery conviction would be excluded. Battery is not like the other offenses excluded under § 4A1.2( c), *see United States v. Dillon,* 905 F.2d 1034, 1036 (7th Cir. 1990), and the cases we have been able to locate indicate that simple (i.e., misdemeanor) battery is properly counted. *See United States v. Lee,* 995 F.2d 887, 888-89 (9th Cir. 1993) (rejecting argument that such a conviction could not be counted because it was uncounseled); *United States v. Reynolds,* 31 Fed. Appx. 293, 294 (4th Cir. March 29, 2002) (same).

## B. MR. GARZA AND MR. HERNANDEZ TAURINO

Mr. Garza and Mr. Hernandez Taurino argue that their respective 78-month and 63-month sentences were imposed in violation of the Sixth Amendment under *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), because the district court found that the amount of marijuana involved was at least 400 but less than 700 kilograms. This argument, however, is raised for the first time on appeal. Before the district court, Mr. Garza and Mr. Taurino only asserted as a factual matter that the amount of marijuana was less than what the government claimed and what the district court found. They did not argue that the

21

Sixth Amendment prohibited the district court from making findings on drug quantity beyond what was inherent in the jury verdict. Reviewing for plain error under our decision in *United States v. Rodriguez,* 398 F.3d 1291, 1298-1301 (11th Cir. 2005), *cert. denied*, 125 S. Ct. 2935 (2005), we find that there was error and that the error was plain; the district court applied the Sentencing Guidelines in a mandatory fashion after making a factual finding on a contested issue beyond what was inherent in the jury verdict. But we also conclude that Mr. Garza and Mr. Taurino have not established that the error affected their substantial rights. The fact that the district court imposed sentences at the bottom of the applicable ranges under the Sentencing Guidelines is not enough in light of our precedent. *See United States v. Underwood,* 446 F.3d 1340, 1344 (11th Cir. 2006); *United States v. Fields,* 408 F.3d 1356, 1360-61 (11th Cir. 2005).

We note that Mr. Garza's judgment is incomplete, as it does not reflect that Mr. Garza was convicted of violating 21 U.S.C. § 841 (a) (1). We therefore remand to the district court to correct this clerical error. *See United States v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998).

## IV. CONCLUSION

For the reasons set forth above, the convictions and sentences of Mssrs. Garza, Alvarez, McClendon, and Hernandez Taurino are affirmed. We remand, however, for

the district court to amend Mr. Garza's judgment to reflect that Mr. Garza was convicted of violating 21 U.S.C. § 841 (a) (1).

AFFIRMED.