[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-10648

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 28, 2006
THOMAS K. KAHN
CLERK

D.C. Docket No. 04-00201-CR-J-25-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WARREN J. TAYLOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 28, 2006)**

Before ANDERSON, DUBINA and HILL, Circuit Judges.

HILL, Circuit Judge:

Warren J. Taylor was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  Prior to trial, the district court denied his motion to suppress the gun and his statements upon arrest to the law enforcement officers.  Taylor appeals his conviction, asserting as error the denial of his motion to suppress.

## I.

Shortly after midnight on June 14, 2004, the St. Johns County Sheriff received a 911 call, but the caller hung up without saying anything.  The emergency dispatcher twice returned the call, but the person who answered at that number immediately hung up again.  Deputy Sheriff James Robinson, drove to the address corresponding to the phone number, 2130 Ryan Road, to "check on the welfare" of the occupants of that address.  Deputy Robinson was in uniform and driving a marked patrol car.  Sergeant Theresa Meares arrived a few minutes later as back-up for Deputy Robinson.

The Ryan Road address was located in a rural part of the county on about five acres and it included a house, barn, and pond.  The property was fenced at the perimeter with an open field/livestock fence.

Deputy Robinson drove onto the property from the public road, passing through an unlocked gate.  The house sat approximately 150 yards from the gate.

Deputy Robinson parked in front of the house, walked up to the front door, and knocked several times. Taylor walked out from behind the barn, a substantial distance from the house, and approached the house. Taylor was preceded by his dog, which ran up to Deputy Robinson and Sergeant Meares (who had by now arrived on the scene). Taylor yelled to the officers, "Don't shoot my dog, he's all right, he won't hurt you."

Deputy Robinson explained to Taylor that he was there because of a 911 hang-up. Taylor said he had made the call because he and his girlfriend had gotten into an argument. According to Taylor, the girlfriend had become violent, so he had call 911 "to get her off of him," at which point she left. The deputy attempted to ascertain the location of the girlfriend but, as Taylor concedes in his brief, he responded with only a vague answer that "she could be a couple of different places."

Deputy Robinson then asked Taylor where he was when the deputy arrived. Taylor said there was a room in the barn where he liked to "chill out." The deputy noted that no one was in the house and asked why Taylor had gone to the barn. Taylor responded that it was his "hangout spot."

Officer Robinson testified that he was concerned that Taylor's girlfriend might have been hurt in the argument, so he asked for permission to "make sure

3

nobody is back there and everything is okay." Taylor consented, saying "Sure, go ahead."

The officer testified that Taylor was "nonchalant, very cooperative, had no problem with it." Taylor did not testify at the suppression hearing.

While Sergeant Meares stayed with Taylor, Deputy Robinson walked around the corner of the barn and saw a camper trailer nearby. It was drizzling and fresh footprints appeared in the sand that led from the camper to the pond. Deputy Robinson followed the footprints and saw a green military-style pack in the grass line of the pond water, within reach of the edge of the pond. The deputy retrieved it. A knife was visible from outside the pack. Deputy Robinson opened the pack and discovered shotgun shells inside one of the pouches.

Given the absence of the girlfriend and the fact that the pack, containing a knife and shotgun shells, had been thrown into the pond, Deputy Robinson returned to Taylor and explained that he was instituting a criminal investigation. Although he did not arrest Taylor at this time, he informed him of his *Miranda* rights. Taylor was placed in the back of a patrol car, but he was not handcuffed. During this time, the deputies requested by radio that other officers attempt to locate Taylor's girlfriend.

Deputy Robinson went back to the pond to search more fully, and

4

discovered a shotgun lying in about a foot of water. He returned to Taylor and asked him about the shotgun and the pack. Taylor stated that he was a convicted felon and that he did not want to get caught with a prohibited gun. Taylor admitted that he had thrown the gun and pack into the pond when he saw the police cars drive onto the property. He was arrested and subsequently charged with being a felon in possession of a gun, tried and convicted by a jury. We review the district court's denial of his motion to suppress *de novo*. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).

## II.

Taylor contends that the gun and his statements to the officers upon its discovery must be suppressed because the officers' warrantless entry by "affirmatively opening a closed gate at the property here" violated the Fourth Amendment. We do not agree.

The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises. *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (no warrant necessary for officers to approach house to question the occupants). "Absent express orders from the

5

person in possession," an officer may "walk up the steps and knock on the front door of any man's 'castle,' with the honest intent of asking questions of the occupant thereof." *Davis v. United States*, 327 F.2d 301, 303 (9ᵗʰ Cir. 1964). Thus, "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an any private citizen may." *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003).

The initial entry onto Taylor's property in this case was for just such a "knock and talk." The 911 hangup call received by the police was routinely followed up with a call-back to ensure that no action was necessary. When the person answering this call also abruptly hung up, another call was made. This call too was answered, but followed by an immediate hang up. In view of the possibility that someone was in serious trouble and being prevented from communicating with the police, officers were dispatched to the address. This dispatch was legitimate police business. We would consider the police derelict in their duty if they did anything less.

Upon arriving at the address, the officer entered the property, proceeded down the driveway that provided access to the house, went to the front door and knocked on it in order to investigate the suspicious and troubling 911 calls. This conduct is not prohibited by the Fourth Amendment. *Coolidge*, 403 U.S. 443;

6

*Tobin*, 923 F.2d at 1511; *Marasco*, 318 F.3d at 519.

Furthermore, to the extent that the officers moved away from the front door and toward Taylor when they heard him and his dog approaching (Taylor testified he shouted out, "Don't shoot my dog!"), this small departure from the front door also does not trigger the protections of the Fourth Amendment. The officers heard Taylor shout to them, and simply moved toward him to ask him their questions about the 911 call. Such a minor departure from the front door under these circumstances does not remove the initial entry from the "knock and talk" exception to the warrant requirement. *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) ("[A police] officer may , in good faith, move away from the front door when seeking to contact the occupants of a residence."); *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (recognizing "that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of a residence"); *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990) (officer may move away from the front door as part of a legitimate attempt to interview a person); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) (officer's movement to rear of house after receiving no answer at front door was lawful). Thus, contrary to Taylor's assertion that the government must demonstrate probable cause and exigent circumstances" in order to justify the

"initial intrusion onto the property," the government need not do either.  The

officers' initial entry and encounter with Taylor were both covered by the "knock

and talk" exception to the Fourth Amendment's requirement for a warrant.[1]

Somewhat more problematic is the subsequent search of the pond by Deputy

Robinson.  Despite his contention to the contrary, there is little doubt that Taylor

freely consented to a search of the area around the barn.  *United States v. Zapata*,

180 F.3d 1237, 1242 (11th Cir. 1999) (failure to inform of right to refuse consent to

search does not invalidate otherwise valid consent); *United States v. Purcell*, 236

F.3d 1274, 1281 (11th Cir. 2001) (voluntariness of consent measured by totality of

circumstances).  There is, however, a genuine issue concerning the extent of the

---

[1]Furthermore, even if the Fourth Amendment were applicable to the officers' entry onto Taylor's property, the exigent circumstances exception to the requirement for a warrant would justify their entry onto his property.  In *United States v. Holloway*, 290 F.3d 133, 1337 (11th Cir. 2002), we held that "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception."  In *Holloway*, police received a 911 call reporting gun shots and arguing coming from a home.  The officers arrived within minutes and observed a man and a woman on the front porch.  After ordering them to vacate the porch, the officers searched it and found a firearm.  The man, a felon, was charged with possession of the firearm.  *Id.*
　In upholding the conviction, we said that:
> Under the circumstances known to them at that time, the officers
> reasonably believed an emergency situation justified a warrantless
> search of Appellant's home for victims of gunfire.  The possibility
> of a gunshot victim lying prostrate in the dwelling created an
> exigency necessitating immediate search.  *Id.*

　In the instant case, the officers did not even enter the home.  The officers merely entered the property and knocked on the front door.  They were responding to a 911 hang up call and two more hang-ups, trying to determine if there was an emergency that prevented the caller from answering the call-backs.  Such an entry falls squarely within the exigent circumstances exception.

search consented to.

Deputy Robinson testified that because he remained concerned about Taylor's "missing" girlfriend, and since he had observed Taylor coming from behind the barn, he asked Taylor if he could "look around to see why he was coming from around the barn." Taylor responded "Sure, go ahead." When Robinson went behind the barn, however, he observed fresh footprints leading from a camper trailer down to the pond. He testified he followed the footprints to the pond and subsequently discovered the backpack containing the knife and shotgun shells.

Although it is clear that Taylor consented to a search of the area behind the barn, it is equally clear that he did not explicitly agree to a search of the pond. This raises the issue of the scope of the consent he gave. As we said in *Strickland*,

> A consensual search is confined to the terms of its authorization. The scope of the actual consent restricts the permissible boundaries of a search in the same manner as the specifications in a warrant. When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless. Rather it is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass.

*United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). Therefore, the warrantless search of the pond was lawful only if Taylor's consent to the search of the "barn" area extended to the pond or if this area was not protected by the Fourth

9

Amendment in the first place. We shall examine the latter of these two possibilities first, since if Taylor had no protected privacy interest in the pond area, no consent was required to search it.

The private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself. *Oliver v. United States*, 466 U.S. 170, 180 (1984). At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes." *Id.* (internal citation omitted).

The Court reaffirmed this position in *United States v. Dunn*, 480 U.S. 294, 300 (1987), stating that "[in *Oliver*] we recognized that the Fourth Amendment protects the curtilage of a house." But the Court recognized that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Id.* Thus, although the private property immediately adjacent to a home is treated as the home itself, this area is not unlimited. It is limited to that property that the individual should reasonably expect to be treated as the home itself. *Id.*

In this case, then, the question is whether Taylor should reasonably have expected the portion of the property around the pond to be treated as his home. If

10

so, Deputy Robinson needed Taylor's consent to have lawfully searched the pond.[2]

The Court in *Dunn* identified four factors that assist us in resolving this question: (1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and, (4) the steps the resident takes to protect the area from observation. 480 U.S. at 301; *accord United States v. Hall*, 47 F.3d 1091, 1096 (11th Cir. 1995). We consider whether the pond was curtilage in the context of each of these factors.

(1)    *The pond's proximity to the house*

An area that is substantially removed from and separated by other structures from the house is not within its curtilage. In *Dunn*, the Supreme Court held that a barn, used for storing chemicals, located some sixty yards from the house was not located within its curtilage for Fourth Amendment purposes. 480 U.S. at 302. Characterizing such a distance as "substantial," the Court held that the owner had no reasonable expectation of privacy in an area so far removed from the home. *Id.* Similarly, in *Hatch*, we held that marijuana growing thirty yards and farther from the house and separated from the house by a barn, tack room, taxidermy building

___

[2]The district court found that Taylor's consent extended to the pond despite the fact that Deputy Robinson testified that he "got consent to check the area around the barn," and "didn't get consent to search all over the property." We express no view on this conclusion.

11

and some stock pens was sufficiently removed from the house so as to be beyond its curtilage. *United States v. Hatch*, 931 F.2d 1478, 1481 (11th Cir. 1991). In order to lie within the curtilage, we have held, an area must be an integral part of that group of structures making up the "immediate domestic establishment of the home." *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) ("Since the marijuana field was located beyond all of the buildings on the Berrongs' property, it was beyond the curtilage of the home").

In this case, Deputy Robinson testified without contradiction that the barn was approximately 130 feet away from the house, and that the shore of the pond where he initially discovered the pack containing the knife and shells is about 100 feet farther away, through a grassy area and down an embankment. The pond was separated from the house by the barn and another structure. These facts are undisputed and supported by the aerial photographs admitted into evidence at trial. They lead us to the conclusion that the pond, some sixty yards away from and separated by other structures from the house, was not within the curtilage of Taylor's home. *Dunn*, 480 U.S. at 302-03; *Hatch*, 931 F.2d at 1480; *Berrong*, 712 F.2d at 1374.

2)      *The uses to which the pond is put*

In *Dunn*, the Court found it "especially significant" that the barn, used for

storing chemicals, was not being used "for intimate activities of the home." 480 U.S. at 302-03. Similarly, in *Hatch*, we held that the growing of marijuana in an open field was significantly not an intimate activity of the home. 931 F.2d at 1482.

In this case, the pond was certainly not being used in connection with any "intimate activity of the home." Taylor could have had no reasonable expectation that the pond was a part of his home that was protected by the Fourth Amendment. Thus, the pond's use did not put it within the curtilage.

3)    *Whether the pond was within an enclosure containing the house*

An area within an enclosure surrounding the home may be within its curtilage. In *Dunn*, for example the Court found it significant the house was surrounded by a fence that clearly established the area around the house as a distinct area within the property. 480 U.S. at 302-03. Similarly, in *Hatch*, we held that the presence of a partial fence around the house defined its curtilage. 931 F.2d at 1481.

In this case, there is no fencing around the house and pond that might bring the pond within the curtilage of the house. There is only the outer perimeter fence around the whole five acres. Thus, there is no enclosure containing both the house and the pond that would bring the pond within the curtilage.

13

4)      *The Steps Taken to Protect the Area from Observation*

There is no reasonable expectation of privacy for activities conducted out of doors, in open fields, except in the areas shielded from view and immediately surrounding the home. *Oliver v. United States*, 466 U.S. 170, 178 (1984). The Fourth Amendment does not extend protection to open fields, which includes any unoccupied or undeveloped area beyond the "immediate domestic establishment of the home ." *Id.* at 180 n.11; *see also Berrong*, 712 F.2d at 1374. A perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property. *Hatch*, 931 F.2d at 1480-81.

In this case, the pond area constituted an open field within the meaning of the Court's holding in *Oliver*. The property on which the house is located consists of approximately five acres, bordered on two sides by roads and surrounded only by a field fence through which one can see the property from the road. Notwithstanding the perimeter fence, Taylor did not have a reasonable privacy interest in the entire five acres of the property. The pond area is situated well beyond the "immediate domestic establishment" of Taylor's home and it is clearly visible from the perimeter fence. No steps have been taken to protect it from view. As an unoccupied and undeveloped area outside the immediate domestic establishment, Taylor had no reasonable expectation of privacy in the area and the

14

pond was not within the curtilage of his home.

Upon review of the four Dunn factors, we conclude that the pond was outside the curtilage of the Taylor home.

Having lawfully entered the Taylor property and received consent to search the area near the pond, Deputy Robinson did not need permission to venture outside the curtilage to follow the footprints leading to the pond.[3]  Therefore, his search there was lawful and the district court correctly denied the motion to suppress the evidence he found.

Accordingly, the denial of the motion to suppress is

AFFIRMED.

---

[3]We need not decide whether the barn was within the curtilage since Deputy Robinson had consent to search there.