UNITED STATES of America

v.

Ariel QUINTANA.

Case No. 8:08–cr–309–T–23EAJ.

United States District Court,
M.D. Florida,
Tampa Division.

Jan. 20, 2009.

Stacie B. Harris, US Attorney's Office, Tampa, FL, for United States of America.

Daneil L. Castillo, Attorney at Law, Tampa, FL, for Defendant.

### ORDER

STEVEN D. MERRYDAY, District Judge.

The defendant moves to suppress (Doc. 15, 32),* and the United States opposes the motion (Doc. 21). Pursuant to an order of referral, United States Magistrate Judge Elizabeth A. Jenkins conducted an evidentiary hearing and issued her report (Doc. 42) recommending granting the motion for leave to amend (Doc. 31), denying as moot the first amended motion to suppress (Doc. 15), and granting the second amended motion to suppress (Doc. 32). The defendant's motion for rehearing (Doc. 48) was denied (Doc. 58), and the defendant objected (Doc. 59) to certain legal conclusions in the report and recommendation.

The magistrate judge's report and recommendation (Doc. 42) is **ADOPTED.** The motion to amend (Doc. 31) is **GRANTED,** and the first amended motion to suppress (Doc. 15) is **DENIED AS MOOT.** The second amended motion to suppress (Doc. 32) is **GRANTED.** The evidence arising from the search of defendant's residence is **SUPPRESSED.** The defendant's objections to the report and recommendation (Doc. 59) are **OVERRULED.**

ORDERED.

* The defendant filed his second amended motion to suppress (Doc. 32) before the court considered the motion to amend (Doc. 31).

1. Defendant filed his Second Amended Motion to Suppress (Dkt. 32) before the court granted him leave to do so. Nevertheless, the court recommends Defendant's Motion for Leave to Amend (Dkt. 31) be granted, recommends Defendant's First Amended Motion to Suppress (Dkt. 15) be denied as moot, and

### REPORT AND RECOMMENDATION

ELIZABETH A. JENKINS, United States Magistrate Judge.

Before the court are Defendant's **First Amended Motion to Suppress** (Dkt. 15), the Government's **Response in Opposition** (Dkt. 21), Defendant's **Motion for Leave to Amend the Pending Motion to Suppress** (Dkt. 31), and Defendant's **Second Amended Motion to Suppress** (Dkt. 32).[1] An evidentiary hearing and oral argument have been held. For the reasons stated herein, I recommend that the Second Amended Motion to Suppress (Dkt. 32) be granted.

### Findings of Fact

The following facts are established by a preponderance of credible evidence.

1. On June 6, 2008, Defendant was traveling in a sedan along Interstate 75 in Collier County, Florida, a route commonly known as "Alligator Alley." Florida Highway Patrol Trooper John Wilcox ("Wilcox"), using a radar gun and a "pace clock" technique, determined Defendant was traveling ninety miles per hour despite a posted speed limit of seventy miles per hour. At approximately 10:44 a.m., Wilcox stopped Defendant for speeding.

2. As Wilcox approached Defendant's vehicle, Defendant rolled down the passenger-side window. Wilcox, who has experience and training in identifying marijuana by smell, detected the odor of raw marijuana emanating from inside the vehicle.[2]

addresses Defendant's Second Amended Motion to Suppress in this report and recommendation. Because the amendments to the Second Amended Motion to Suppress concern evidence presented at the suppression hearing, the Government had an opportunity to respond during closing arguments.

2. Courts have consistently recognized the ability of law enforcement officers to detect the odor of raw marijuana. *See e.g. United*

Wilcox asked Defendant for identification and motioned Defendant to exit the vehicle. Based on Defendant's drivers license and registration, Wilcox verified Defendant's identity as Ariel Quintana.

3. Concerned by the smell of raw marijuana in the vehicle, Wilcox radioed Trooper Mike Gideons ("Gideons") for backup. Gideons arrived approximately five minutes later. Because Defendant spoke only Spanish, Gideons summoned Trooper Yoenis Garcia ("Garcia") to translate for Defendant. Garcia arrived approximately five minutes later.

4. With Garcia's assistance in translating, Wilcox informed Defendant that he detected the odor of raw marijuana emanating from the vehicle and asked if he could search the vehicle. Although Defendant appeared nervous and repeatedly looked at the car, he denied there was marijuana in the vehicle and gave the troopers permission to search it.

5. In the vehicle, Wilcox located a tote or duffel bag in the front passenger seat which smelled strongly of raw marijuana.[3] Inside the bag, Wilcox discovered folded clothing which also carried a strong odor of raw marijuana. On top of the bag, Wilcox found a pair of slip-on shoes, one of which had a green, leafy substance that appeared to be marijuana wedged into the

sole. Nevertheless, Wilcox found no marijuana inside the bag or anywhere else in the vehicle. When Wilcox asked Defendant to explain the odor of marijuana on the bag, Defendant stated he occasionally smoked marijuana.

6. Wilcox then asked Defendant about his itinerary. Defendant explained that he was traveling to Miami to pick up his wife Amy because they were moving to the Ocala area.

7. Soon thereafter Wilcox was informed by a radio dispatcher that Defendant's drivers license was suspended.[4] Defendant was arrested for driving with a suspended license and placed in handcuffs; he was not read his *Miranda* rights at that time.

8. While Defendant was in custody, his cell phone began to ring repeatedly. Without asking for permission, Garcia removed the cell phone from Defendant's pocket and dialed the last caller. Defendant's wife Amy, who lived in Hialeah, Florida, answered the call. Amy told Garcia that she and Defendant were in an "on again off again" relationship and that she was not aware of any plans to move to the Ocala area.

9. After the call ended, Garcia began looking through information in the cell

---

States v. Garza, 236 Fed.Appx. 468, 475 (11th Cir.2006) (per curiam) (unpublished) (recognizing officers detected strong odor from 1500 pounds of raw marijuana); *United States v. Jimenez*, No. 2:06–CR–74–FTM–29DNF, 2006 WL 2927477, at *3 (M.D.Fla. Oct. 11, 2006) (crediting officer's ability to smell raw marijuana coming from defendant); *accord United States v. Ross*, No. 06–4106, 300 Fed. Appx. 386, 389–91, 2008 WL 4888993, at *3–4 (6th Cir. Nov. 12, 2008) (unpublished); *United States v. Brown*, 261 Fed.Appx. 371, 372–73 (3d Cir.2008) (unpublished); *United States v. Vasquez–Castillo*, 258 F.3d 1207, 1213 (10th Cir.2001); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir.2000).

3. Although the record does not indicate whether the bag was open or closed, this fact is immaterial. *See Florida v. Jimeno*, 500 U.S. 248, 251–52, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (finding it reasonable for police to conclude that general consent to search a vehicle for narcotics includes consent to search containers within the vehicle that might bear drugs).

4. Defendant's license was suspended for failure to pay a traffic fine. The record indicates that Defendant did not know that his license was suspended nor did the officers have any evidence that Defendant knowingly drove with a suspended license.

phone, including a digital photo album, hoping to find evidence related to the odor of marijuana in Defendant's vehicle. Garcia saw photos of an intimate nature involving a woman as well as a photo of marijuana plants in what he characterized as a marijuana "grow house." [5] Defendant stated that someone had sent him the photo of the house. Garcia showed the photo to Wilcox, who surmised that it may have been connected to the Lutz, Florida address listed on Defendant's drivers license.

10. At approximately 11:00 a.m. Wilcox telephoned Trooper Steve Varnell ("Varnell") in Hillsborough County, more than one hundred miles away from the scene of the traffic stop, and notified him that he suspected there was a marijuana grow house at Defendant's address.[6] Wilcox informed Varnell that there could be a woman and two children at the residence who spoke only Spanish. Varnell, his son Trooper Steven E. Varnell ("Varnell Jr."), and Trooper Justin May ("May"), who speaks limited Spanish, proceeded to the address to investigate.[7]

11. At approximately 11:40 a.m. the troopers arrived at the residence, which was enclosed by a fence with a locked, electronic driveway gate, located approximately fifty yards from the home itself. There was also a smaller gate twenty-five to thirty feet from the driveway gate with a closed flip-type latch; the gate opened up into a wooded area located on the property. From the driveway gate, the view of the house was obscured by woods making it difficult to see any part of the house. There was nothing from outside the fenced area to indicate the residence was the site of a marijuana grow operation.

12. At approximately 11:53 a.m., following Varnell's instructions, Varnell Jr. jumped over the fence and unlocked the driveway gate. Varnell and May walked through the driveway gate and all three troopers proceeded toward the house. As they entered a paved driveway area near the front of the residence, they detected the odor of raw marijuana, heard mechanical sounds coming from a nearby garage, and observed that the windows were "blacked out." While May waited outside, Varnell and Varnell Jr. entered the open doorway of a detached garage next to the residence. Varnell concluded that the residence was in fact the site of a marijuana grow operation.

13. Varnell telephoned Wilcox, who was still at the scene of the traffic stop on Alligator Alley, and informed Wilcox of his conclusion. Using a card with *Miranda* rights written in Spanish (Gov't. Ex. 4), Garcia read Defendant his *Miranda* rights in Spanish, which Defendant acknowledged understanding. Using the information furnished to Wilcox by Varnell, Garcia informed Defendant that troopers had detected the odor of marijuana at the Lutz residence. Defendant then admitted there was a marijuana grow operation at the Lutz residence involving approximately 175 marijuana plants.

**5.** Both Defendant and his wife Amy testified at the suppression hearing that Amy was the woman depicted in the photos.

**6.** That only sixteen minutes elapsed between the traffic stop and Wilcox's call to Varnell seems improbable given the intervening activities. Yet this is the timeline indicated by the record. However, even if a longer period of time elapsed, the length of the investigatory stop is not a dispositive issue.

**7.** Varnell has extensive training in narcotics investigations, including numerous classes with the Drug Enforcement Administration. Further, he is an instructor for a multi-jurisdictional counter-drug task force. Through his training, he is able to detect the odor of raw marijuana.

14. Defendant was subsequently transported to the Florida Highway Patrol station in Naples where he was given a form, written in both English and Spanish and time-stamped 12:25 p.m., asking for consent to a search of the Lutz property (Gov't. Ex. 1). Although Garcia attempted to read the form to Defendant, Defendant stated that he understood the form and signed it. After a copy of the consent form was faxed to a Florida Highway Patrol station in Hillsborough County, the troopers at the Lutz residence were verbally notified of the consent. At approximately 1:40 p.m., the troopers, then joined by agents with the Drug Enforcement Administration ("DEA"), conducted a warrantless search of the interior of the residence and a Haulmark trailer parked behind the home. They located marijuana plants and instruments used to cultivate marijuana.

15. At some point after signing the consent form, Defendant was issued a citation for driving with a suspended license and released from custody for purposes of that charge. Although Defendant was no longer under arrest, Defendant wrote a sworn statement in Spanish promising to travel with the police to the Lutz residence (Gov't. Ex. 2). The Florida Highway Patrol then transported Defendant from Naples to Lutz, with Defendant riding uncuffed in the front seat.

Upon Defendant's arrival in Lutz around 4:00 p.m., DEA Agent Larson ("Larson") read Defendant his *Miranda* rights in Spanish and Defendant stated he understood them. Although Defendant was not placed under arrest or in handcuffs, he was interviewed by Larson and May while law enforcement continued the search of the residence. Toward the end of the interview, May provided Defendant with a statement, handwritten by May in Spanish, giving the Florida Highway Patrol permission to seize any electrical items related to the cultivation of marijuana. Defendant signed his name below the statement. Defendant was then given an indemnification form (Gov't. Ex. 3), written in English, allowing the officers on the scene to seize evidence from the Haulmark trailer. May "summarized" this form for Defendant, and Defendant signed it as well.[8]

### Conclusions of Law

### I. The Duration of the Stop

■ Defendant first argues that he was improperly detained beyond the time allowed by law. Defendant submits that once the troopers determined there was no marijuana in the vehicle they should have issued him a speeding citation and allowed him to depart. The Government responds that it was entitled to detain Defendant pending the completion of a computer check of his drivers license record.

Defendant overlooks that "[a] traffic stop for speeding can doubtlessly last long enough for the police to ask questions about the reasons for speeding and to conduct a variety of checks about licenses, registration, insurance and so on." *United States v. Hernandez*, 418 F.3d 1206, 1212 n. 7 (11th Cir.2005). Less than thirty minutes elapsed between the initial stop of Defendant's vehicle and the completion of the search. Moreover, the computer check of Defendant's license had not yet been completed. Thus, the troopers did not unlawfully detain Defendant beyond the time allowed by law.

---

8. While it is doubtful that this form was properly translated for Defendant, this issue is not relevant to the disposition of Defendant's motion because the indemnification form merely relieved the Florida Highway Patrol of liability regarding the Haulmark trailer (Gov't. Ex. 3).

## II. *The Legality of the Arrest for Driving With a Suspended License*

█ Next, Defendant contends that the troopers had no reason to believe that he knew his license was suspended, and therefore should not have arrested him for knowingly driving with a suspended license.[9] Defendant asserts that at most he committed a civil infraction which was insufficient to justify a full custodial arrest. The Government responds that even if the arrest was not authorized under state law, it was lawful for purposes of the Fourth Amendment.

█ While Florida is free to regulate arrests however it desires, Florida law does not alter the Fourth Amendment's protections regarding warrantless arrests. "When officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest, and to search the suspect in order to safeguard evidence and ensure their own safety." *Virginia v. Moore,* —— U.S. ——, 128 S.Ct. 1598, 1608, 170 L.Ed.2d 559 (2008). Probable cause exists where the facts and circumstances would cause a prudent person to believe that a suspect is committing an offense. *Jordan v. Mosley,* 487 F.3d 1350, 1356 (11th Cir.2007). Probable cause of even a "very minor criminal offense" such as a misdemeanor provides law enforcement with the justification for a full custodial arrest. *Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001).

Under Florida law, driving with a suspended license without knowledge of the suspension is a non-criminal infraction punishable by fine but not by imprisonment. Fla. Stat. § § 322.34(1) and 318.13(3); *see Thomas v. State,* 614 So.2d 468, 470 (Fla.1993). By contrast, one who knowingly drives with a suspended license is guilty of a misdemeanor or felony. Fla. Stat. § 322.34(2) (2008).

While the knowledge element may be critical in securing a conviction under Fla. Stat. § 322.34(2), "[n]o officer has a duty to prove every element of a crime before making an arrest." *Jordan,* 487 F.3d at 1355; *see e.g. United States v. Everett,* 719 F.2d 1119, 1120 (11th Cir.1983) ("While intent is an element of the crime [of passing counterfeit currency], it is not necessary in order to establish probable cause to arrest."). "All that is required is probable cause to believe that the suspect did the prohibited acts." *Jordan,* 487 F.3d at 1356; *see also McGuire v. City of New York,* 142 Fed.Appx. 1, 3 (2d Cir.2005) (unpublished) ("[W]hen an officer has evidence that a defendant has engaged in conduct proscribed by law-whether transporting a quantity of drugs, possessing a stolen item, or driving with a suspended license-he has probable cause to arrest the person even without specific evidence on the elements of knowledge and intent that will have to be proved to secure a conviction at trial.").

The fact that Wilcox observed Defendant driving with a suspended license provided him with probable cause to arrest Defendant for knowingly driving with a suspended license. Although the record is devoid of evidence that Defendant knew his license was suspended, such evidence was not required to establish probable cause for an arrest. Defendant's arrest was therefore lawful under the Fourth Amendment.

## III. *The Search of Defendant's Cell Phone Incident to His Arrest*

█ Defendant next argues that, even if the arrest was lawful, the troopers exceed-

---

9. Defendant no longer argues that law enforcement lacked probable cause to stop the vehicle for speeding. The Government's evidence of this is irrefutable.

ed the scope of their authority to search his person when Garcia removed Defendant's cell phone from his pocket while Defendant was handcuffed and began looking through the digital photo album on the phone. The Government justifies the search as incident to a lawful arrest.

■ Cellular phones contain "a wealth of private information" such as recent-call lists, emails, text messages, and photographs. *United States v. Zavala*, 541 F.3d 562, 577 (5th Cir.2008). An owner of a cell phone generally has a reasonable expectation of privacy in the electronic data stored on the phone. *See Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 905 (9th Cir. 2008) (finding reasonable expectation of privacy in text messages stored on cell phone); *United States v. Finley*, 477 F.3d 250, 259 (5th Cir.2007) (same). Thus, a search warrant is required to search the contents of a cell phone unless an exception to the warrant requirement exists. *See United States v. James*, No. 1:06CR134 CDP, 2008 WL 1925032, at *4 (E.D.Mo. Apr. 29, 2008).

■ One such exception is for a search incident to a lawful arrest. The Fourth Amendment tolerates these searches because they provide for the safety of law enforcement and prevent the destruction or concealment of evidence. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Once an occupant of an automobile is placed under arrest, law enforcement may contemporaneously search both the occupant himself and the passenger compartment of the automobile. *United States v. Gonzalez*, 71 F.3d 819, 825 (11th Cir.1996). Importantly, although *Chimel* provides the underlying rationale for allowing a search incident to an arrest, authority to conduct such searches does not turn on the probability that weapons or evidence will be discovered. *United States v. Robinson*,

414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

The Fifth Circuit has allowed the search of a cell phone incident to a lawful arrest, reasoning that if law enforcement has probable cause to arrest, it may "look for evidence of the arrestee's crime on his person in order to preserve it for use at trial." *Finley*, 477 F.3d at 259–60 (approving search of cell phone incident to arrest for drug trafficking where more incoming calls to the phone could have destroyed evidence located on the phone's recent contacts lists). Other courts have adopted similar reasoning. *See United States v. Young*, 278 Fed.Appx 242, 245–46 (4th Cir. 2008) (per curiam) (unpublished) (citing *Finley* and crediting "the manifest need of the officers to preserve evidence"); *United States v. Santillan*, 571 F.Supp.2d 1093, 1102 (D.Ariz.2008); *United States v. Deans*, 549 F.Supp.2d 1085, 1093–94 (D.Minn. 2008); *United States v. Mercado–Nava*, 486 F.Supp.2d 1271, 1278–79 (D.Kan.2007); *see also United States v. Ortiz*, 84 F.3d 977, 984 (7th Cir.1996) (allowing search of electronic information on pager). Notably, the defendants in these cases were arrested for drug-related activity when their electronic devices were searched. The courts recognized that the devices may have been used to communicate with others participating in, e.g., drug-trafficking. Consequently, there was a reasonable probability that information stored on the device was "evidence of *the arrestee's crime*." *Finley*, 477 F.3d at 260 (emphasis added).

Whether a cell phone may be searched incident to an arrest to prevent the destruction or concealment of evidence of another crime is a different issue. In *Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998), the Supreme Court addressed the preservation-of-evidence issue in the context of a traffic stop

for speeding. There, the officer issued the defendant a citation, searched his car, and found marijuana in the vehicle. The Court unanimously concluded that the need to discover and preserve evidence disappeared once the defendant was issued a citation for speeding, reasoning that any evidence necessary to prosecute "that offense" had been obtained. *Id.* at 118, 119 S.Ct. 484. The Court emphasized that no further evidence "of excessive speed" would have been found on the defendant or in the car and broadly stated that "the concern for destruction or loss of evidence [was] not present at all." *Id.* at 118–19, 119 S.Ct. 484. The Court reasoned that "the possibility than an officer would stumble onto evidence wholly unrelated to the speeding offense seem[ed] remote." *Id.* at 118, 119 S.Ct. 484. Although the Court focused on the fact that the defendant was never actually arrested, the Court's analysis suggests that a search incident to arrest to preserve evidence is permissible only to secure evidence of the crime of arrest, not evidence of an unrelated crime.

Additional guidance on this issue may soon be forthcoming. In *Arizona v. Gant,* — U.S. ——, 128 S.Ct. 1443, 170 L.Ed.2d 274 (2008), a case concerning the search of an automobile incident to an arrest, the Supreme Court granted certiorari on the following question:

> Does the Fourth Amendment require law enforcement officers to demonstrate a threat to their safety or a need to preserve evidence related to the crime of arrest in order to justify a warrantless vehicular search incident to arrest conducted after the vehicle's recent occupants have been arrested and secured?

During oral argument, Justice Stevens commented that "the interest in preserving evidence really should only be present when there is probable cause to believe there is some evidence." Transcript of Oral Argument at 21, *Gant,* 128 S.Ct. 1443.[10] Justice Scalia opined that "if you're going to use [the preservation-of-evidence] rationale you have to link the reason for the arrest with the likelihood that there would be any evidence found in the car that would support the arrest." *Id.* at 22. Justice Scalia seemed skeptical that law enforcement could arrest someone and then "rummage around for evidence of a different crime." *Id.*; *see also Thornton v. United States,* 541 U.S. 615, 632, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (Scalia & Ginsburg, JJ., concurring in the judgment) (reasoning that an evidentiary search of an automobile incident to an arrest should be allowed only where it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle").

Here, rather than seeking to preserve evidence that Defendant was driving with a suspended license, Garcia was rummaging for information related to the odor of marijuana emanating from the vehicle. Where a defendant is arrested for drug-related activity, police may be justified in searching the contents of a cell phone for evidence related to the crime of arrest, even if the presence of such evidence is improbable. In this case, however, Defendant was arrested for driving with a suspended license. The search of the contents of Defendant's cell phone had nothing to do with officer safety or the preservation of evidence related to the crime of arrest. This type of search is not justified by the twin rationales of *Chimel* and pushes the search-incident-to-arrest doctrine beyond its limits. *See Thornton,* 541 U.S. at 624, 124 S.Ct. 2127 (O'Connor, J., concurring in part); *see*

---

**10.** The oral argument transcript is also available at 2008 WL 4527980 (U.S. Oct. 7, 2008).

*also Evans v. Stephens,* 407 F.3d 1272, 1297 (11th Cir.2005) (finding strip search for drugs incident to arrest for driving under the influence unlawful where officer "did [not] have any reason to believe that the strip search would reveal relevant evidence"); *State v. Smith,* No. 07–CA–47, 2008 WL 2861693, at *8 (Ohio 2d DCA July 25, 2008) (affirming trial court's decision in drug case to admit cell phone's call records but suppress incriminating photos found in the phone because there was no reasonable suspicion that the photo album would contain such evidence).

Accordingly, the information obtained pursuant to Garcia's search of the cell phone photo album should be suppressed. Because this information—a photo of a "grow house"—directly led to and tainted the preliminary search of the Lutz residence, any information discovered during that search should also be suppressed. Nonetheless, suppression of the evidence discovered in the cell phone is not dispositive of Defendant's motion because the preliminary search of the Lutz residence was unlawful for additional reasons discussed below.[11]

## IV. *The Troopers' Initial Visit to the Lutz Address*

■ Defendant next submits that regardless of the legality of the cell phone search, the troopers who initially visited the Lutz address violated his Fourth Amendment rights when one of them jumped over the fence, unlocked the electronic driveway gate, and then with other troopers approached the residence. De-

fendant asserts a reasonable expectation of privacy in the area between the fence and the residence which the officers unlawfully entered after proceeding through the driveway gate. Therefore, Defendant argues that any evidence flowing from the troopers' initial intrusion onto the Lutz property should be suppressed. The Government responds that the initial approach to the front door of the Lutz residence was conducted pursuant to the "knock and talk" exception to the warrant requirement.[12]

■ Like the home itself, the private property immediately adjacent to a home is entitled to protection against unreasonable search and seizure. *United States v. Taylor,* 458 F.3d 1201, 1206 (11th Cir.2006). The extent of this area, known as the curtilage, "is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). There are four factors that must be examined to determine the boundaries of the curtilage: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.* at 301, 107 S.Ct. 1134.

It was not at the driveway gate, but at the paved area near the residence that the troopers detected the odor of marijuana.

11. Defendant also challenges the authority of the Florida Highway Patrol to conduct a narcotics investigation of a residence located over one-hundred miles from the site of a traffic stop. *See* Fla. Stat. § 321.05 (2004) (outlining duties, functions, and powers of Florida Highway Patrol officers). Because the searches of Defendant's cell phone and

the Lutz residence were unlawful for other reasons, it is unnecessary to address this argument.

12. The Government first raised the "knock and talk" exception during closing argument at the suppression hearing.

The paved area was in close proximity to the home, but was approximately fifty yards from the fenced enclosure. The troopers were unable to view the residence from the driveway gate because of a wooded area. Given the proximity of the paved area to the home, the paved area was concealed as well. Thus, the paved area was within the curtilage of the residence for Fourth Amendment purposes.

■ However, the sanctity of the curtilage is not absolute. "The Fourth Amendment ... is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *Taylor*, 458 F.3d at 1204. While reasonable suspicion does not alone justify a warrantless search of a residence, it permits law enforcement to approach a residence to ask questions. *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir.1991). Thus, "[a]bsent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's castle, with the honest intent of asking questions of the occupant thereof." *Taylor*, 458 F.3d at 1204 (citation and internal quotations omitted). Law enforcement may "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may." *Id.* (citation and internal quotations omitted); *see also United States v. Carroll*, 144 Fed.Appx. 3, 4 (11th Cir.2005) (per curiam) (unpublished) (finding officer who first approached front door of residence could proceed to back door because a sign on the front door directed visitors to do so); *cf. Edens v. Kennedy*, 112 Fed.Appx. 870, 875 (4th Cir. 2004) (per curiam) (unpublished) (noting that a homeowner is likely to receive visits from the public at large "[i]n the absence of a fence with a locked gate").

With this background there are two critical questions to be answered. First, there is the issue of whether the troopers' entry onto the Lutz property was truly "unconnected with a search of the premises." *Taylor*, 458 F.3d at 1204. The evidence is in conflict. Defendant was in custody on Alligator Alley at the time the troopers entered the property; they certainly had no intent to question him at the residence in Lutz. Further, there is no evidence that anyone was at the Lutz residence when the troopers entered the property. Yet Varnell indicated he had been told there could be a woman and two children at the residence. Varnell further stated he was concerned that the potential occupants did not speak English and thus summoned May to interpret.

■ Regardless, even assuming the troopers' entry was unconnected with a search of the premises, the Government has failed to show that the troopers approached the residence "just [as] any private citizen [could]." *Id.* Varnell testified that he ordered Varnell Jr. to jump the fence. Presumably, this was due to the troopers' inability to otherwise approach the residence in the manner expected of a mail deliverer or salesperson. Varnell Jr. unlocked the gate through which the other troopers proceeded. These actions were beyond what would reasonably be expected of any private citizen such as a mail deliverer or salesperson. Any "knock and talk" exception to the Fourth Amendment warrant requirement did not apply to the troopers' initial entry onto the paved area near the residence. Accordingly, the troopers' search of the curtilage at the Lutz residence violated Defendant's Fourth Amendment rights and any evidence flowing from this intrusion, including any post-arrest statements made by Defendant, must be suppressed.

## V. Defendant's Consent to the Search of the Lutz Residence

▮▮▮▮ The Government submits that the eventual full-scale search of the Lutz residence was nonetheless lawful because Defendant gave his voluntary consent for the troopers to search the residence when he signed a consent form prepared by Garcia. The Government is correct that the warrant requirement may be excused by the voluntary consent of an individual possessing authority to allow the search. *Georgia v. Randolph*, 547 U.S. 103, 109, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). Consent may not be coerced, "by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Rather, the government bears the burden of showing the consent was "freely and voluntarily given." *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

▮▮▮▮ A consent to search may be insufficient where the consent itself springs from prior illegal activity by the police, such as an unlawful entry. *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir.2007). In such cases, "[t]he proper inquiry is not simply whether [a defendant's] will was overborne by [law enforcement's] illegal entry, but also whether [the defendant's] consent was a 'product' of that illegality." *United States v. Santa*, 236 F.3d 662, 677 (11th Cir.2000) (finding consent invalid where given three minutes after DEA agents unlawfully kicked in the defendant's door, entered his apartment, ordered him to the floor, and handcuffed him); *see e.g. United States v. Myers*, 290 Fed.Appx. 305, 307–08 (11th Cir.2008) (per curiam) (unpublished) (remanding where district court found consent was voluntary but failed to determine whether it was tainted by prior illegal search). The government bears the bur-den of proving that a consent following illegal police activity was not fruit of the poisonous tree. *Delancy*, 502 F.3d at 1308. Three factors helpful in making this determination are "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and fla-grancy of the official misconduct." *Id.* at 1309.

Although the temporal factor is not de-fined by a bright line rule, a shorter period of time weighs in favor of exclusion and a longer interval weighs in favor of admissi-bility. *Id.* at 1310. Here, the official mis-conduct occurred at approximately 11:53 a.m. and Defendant was provided with the consent form at approximately 12:25 p.m. (Gov't. Ex. 1). Thus, approximately thirty-two minutes passed between the time of the unlawful search of the curtilage and the time Defendant signed the consent form. This is a relatively brief period of time and thus weighs in favor of exclusion. *Compare Santa*, 236 F.3d at 666–68 (find-ing two to three minutes insignificant) *and United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir.2003) (finding a three minute period resulted in "extremely close temporal proximity") *with Devier v. Zant*, 3 F.3d 1445, 1459 (11th Cir.1993) (finding no taint where confession occurred four days after detention).

Next, the intervening circumstances fac-tor weighs in favor of admission where a defendant is unambiguously informed of any pertinent constitutional rights. In *De-lancy*, the court found that an individual's review and signing of a consent form

> served as a notification … of her constitutional rights. The written form unambiguously informed [her] that she had a right to refuse to give consent, that she could demand that a warrant be obtained prior to any search, that she could consult with an attorney before

consenting, that any contraband or evidence seized could be used against her in a court of law, and, finally, that she could withdraw her consent at any time.... [A detective] went over the form with [her] carefully, and the district court found that [she] understood what it meant.... [T]his thorough notification of constitutional rights constitutes an important intervening circumstance.

*Delancy*, 502 F.3d at 1311. Notably, the consent form in *Delancy* was relevant not because it demonstrated voluntariness, but rather because it showed an awareness of Fourth Amendment rights at the time of consent. *Id.* Thus, the court concluded that the consent form weighed against suppression because any causal connection between the unlawful prior search and the consent had become attenuated. *Id.*

Here, the consent form was of a simpler design. The statement of rights on the form was limited to the following:

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that I give this consent freely and voluntarily, and that no promises, threats, force, or physical or mental coercion, of any kind whatsoever, have been used against me to get me to consent to the search described above or to sign this form.

(Gov't. Ex. 1). Even assuming Defendant was aware of his right to refuse consent, he was not so fully informed of his Fourth Amendment rights as to sufficiently dissipate the taint of the unlawful search. This factor weighs neither for nor against suppression.

Finally, the court must examine the "purpose and flagrancy" of the unlawful search of the curtilage. The troopers assert they approached the front door in order to conduct a "knock and talk" and ask questions of any occupants, a legitimate purpose for entry. *See Delancy*, 502 F.3d at 1312 (finding the police may have a lawful purpose for an entry even where the entry itself is unlawful). Nevertheless, they jumped a fence and unlocked a gate to get to the front door, and then entered an open doorway into the garage. These actions speak less of an effort to inquire of occupants and more of an effort to determine whether the residence was the site of a marijuana grow operation. The troopers simply could not make this determination from the street or the area immediately inside the fence, and proceeded to conduct a preliminary investigation of the premises without a search warrant. This factor weighs in favor of suppression. *See id.* ("If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, we would be bound to find the consent tainted.").

As for the flagrancy of the unlawful search, although the physical intrusion did not extend to the residence or cause any damage, the evidence discovered during the search of the curtilage was critical. At the time Defendant was handcuffed at the site of the traffic stop, the troopers had not requested permission to search the Lutz residence. It was over forty minutes later, after Varnell reported back to Wilcox regarding the preliminary search, that the troopers suddenly Mirandized Defendant and informed him they had detected the odor of marijuana at the residence. Defendant's subsequent admission that he was operating a marijuana grow operation was clearly a product of the unlawful search by the three troopers. Moreover, once Defendant was transported to the Florida Highway Patrol station and provided with the consent form, he knew or had reason to believe that law enforcement had already found enough evidence to conclude the Lutz residence was the site of a

marijuana grow operation. Altogether, the use of the information discovered during the preliminary search weighs in favor of suppression because the troopers exploited the information to persuade Defendant to consent to a full search of the residence. *See id.* (emphasizing that the police did not exploit evidence found prior to consent when obtaining consent).

Taken together, these factors lead to the conclusion that Defendant's consent was tainted by the unlawful entry into the curtilage of the Lutz residence. A brief period of time separated the entry and the signing of the consent form, Defendant was not thoroughly informed of his Fourth Amendment rights through the consent form, and the troopers' purpose in approaching the residence was clearly to make a determination that they later relied upon when asking for the consent. Given the troopers did not ask for consent until after the unlawful search, it appears the troopers exploited their observations from the search when determining whether and how to seek Defendant's consent for a full-scale search of the residence. The Government has not met its burden of establishing that the consent was not a product of the illegal entry.

## VI. *The Full–Scale Search of the Residence and Haulmark Trailer*

■ Because Defendant's consent to the subsequent warrantless search of the residence and Haulmark trailer was invalid, the search was unreasonable under the Fourth Amendment.[13] Therefore, the court must determine whether any evidence flowing from that search was the "fruit of the poisonous tree." *United States v. Bailey*, 691 F.2d 1009, 1012–13 (11th Cir.1982).

■ The simple fact that evidence would not have been discovered "but for" unlawful police conduct does not alone justify exclusion of that evidence. *Id.* at 1013. Rather, when evidence is seized during an illegal search, "it will be suppressed as the tainted product of the unlawful police action, unless the prosecution carries its burden of showing that the taint has been purged." *Id.* The court must determine "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "The government may 'purge the taint' by proving that there was a break in the causal link between the initial illegal search and the eventual seizure, such as by establishing that the evidence in question was seized pursuant to an independent source." *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir.2002).[14]

The evidence Defendant seeks to suppress was discovered during the full-scale search of the residence and Haulmark

---

**13.** Alternatively, warrantless searches of a residence are permitted where probable cause and exigent circumstances are present. *United States v. $291,828.00 in U.S. Currency*, 536 F.3d 1234, 1237 (11th Cir.2008). However, the Government does not argue that the exigent circumstances exception applies in this case, and such an argument would be plainly frivolous.

**14.** Another exception to the exclusionary rule applies where "the government inevitably would have discovered [evidence] without the aid of the unlawful police conduct." *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir.1982). Regardless, the Government does not argue, and the record does not indicate, that the inevitable discovery exception applies to this case.

trailer.[15] There was no break in the causal link between this unlawful search and the seizure of the marijuana plants. The Government has not established that the evidence was seized pursuant to a lawful independent source.[16] Because the evidence was not procured by means sufficiently distinguishable to be purged of the taint of the unlawful search, it must be suppressed.

### Conclusion

Defendant was lawfully stopped for speeding and his arrest for driving with a suspended license was supported by probable cause. The search of Defendant's cell phone, however, was not a valid search incident to an arrest and tainted the resulting search of the curtilage of the Lutz residence. Further, Defendant's Fourth Amendment rights were violated when troopers searched the curtilage without a warrant. The Government has failed to satisfy its burden of establishing that the taint from the unlawful search of the curtilage was sufficiently dissipated from Defendant's subsequent consent. Therefore, the consent did not excuse the warrantless full-scale search of the residence and Haulmark trailer and the evidence seized during that search should be suppressed.

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1) Defendant's Motion for Leave to Amend the Pending Motion to Suppress (Dkt. 31) be **GRANTED;**

(2) Defendant's First Amended Motion to Suppress (Dkt. 15) be **DENIED AS MOOT;** and

(3) Defendant's Second Amended Motion to Suppress (Dkt. 32) be **GRANTED.**

Date: December 10, 2008.

---

**15.** The Haulmark trailer was parked behind the home and was within the curtilage for the same reasons that the paved area was within the curtilage.

**16.** Although Defendant signed a form handwritten in Spanish by May permitting the troopers to seize electrical items, this "consent" suffers the same problems as the con-

sent given at the Florida Highway Patrol station. Moreover, at this point Defendant was "face to face with the incriminating evidence ... and able to see that the police had firm control over [his] home." *United States v. Delancy,* 502 F.3d 1297, 1313 (11th Cir.2007) (citation and internal quotations omitted).