**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 36427**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **2013 Opinion No. 44** |
| Plaintiff/Respondent/ | ) | |
| Cross-Appellant, | ) | **Filed: July 17, 2013** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| LEOTIS B. BRANIGH, III, | ) | |
| | ) | |
| Defendant/Appellant/Cross- | ) | |
| Respondent. | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District, State of Idaho, Nez Perce County. Hon. Jeff M. Brudie, District Judge.

Judgment of conviction for murder in the first degree, <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent. John C. McKinney argued.

---

LANSING, Judge

Leotis B. Branigh, III appeals from his conviction for first degree murder. He contends that the district court erred by denying his motion to suppress records of his cell phone activity, including text messages, that were obtained by the State from his Kansas cell phone provider; by overruling his trial objection to evidence derived from those records; by overruling his objection to three photographs of the decedent's injuries; and by denying his motion for a new trial premised upon new evidence about a State's witness that was suppressed by the prosecutor. He also asserts that the prosecutor committed misconduct during closing argument by referring to facts not in evidence and failing to correct false testimony.

1

# I.

# BACKGROUND

In October 2007, Michael Johnston, the victim in this case, was residing with his ex-wife, Desiree Anderson, as the two were attempting a reconciliation. During the period when Anderson and Johnston were estranged, Anderson had engaged in a romantic relationship with Branigh. When Anderson attempted to break off her relationship with Branigh, he did not accept that decision. He was upset and at times threatened to do physical harm to Anderson. During the afternoon of October 1, 2007, Branigh came to the home that Anderson shared with Johnston and pounded on the front door. Anderson called 911, and Branigh left after police arrived.

On that same day, at about 10:20 in the evening, Johnston was shot and killed outside of his Lewiston home. Responding officers spoke to several eyewitnesses who said the shooter was driving a white car. Officers also spoke with Anderson, who told the officers that Branigh had exchanged numerous text messages with her and with Johnston immediately prior to the shooting. Some of the text messages between her and Branigh were stored on her cell phone, which she read to an officer and which were later photographed and admitted at trial. The messages revealed, generally, that Branigh was upset and was making veiled threats toward Johnston.

Branigh's white Camaro (well known to the police) was quickly spotted in the city by two patrol officers riding in a single vehicle. The police vehicle's emergency lights and siren were activated, but Branigh refused to stop and a high-speed chase ensued. The chase ended when Branigh's rear tire was flattened by shots fired by one of the officers. Branigh was charged with first degree murder.

The police obtained a search warrant from a Nez Perce County magistrate to obtain release of Branigh's electronically-stored cell phone records, including a log of phone contacts and the text messages between Branigh and Anderson and between Branigh and Johnston during a period surrounding the shooting. The police faxed the warrant to Branigh's Kansas-based cell phone provider (Sprint), which produced the records to the police. Branigh moved to suppress those records. The district court initially granted the motion, but on the State's motion for reconsideration, changed its ruling and denied suppression.

At trial, Branigh represented himself, with an attorney appointed to assist him. Branigh objected to admission of the Kansas cell phone records and the text messages found on

Anderson's cell phone. He also objected to the admission of three emergency room photographs of the victim. The court overruled all of these objections. The State's final witness was a jailhouse informant named Stephen Peak, who testified to several incriminating statements allegedly made by Branigh while the two were housed together in the Nez Perce County jail. The jury returned a guilty verdict.

Thereafter, Branigh filed a motion for a new trial, contending that the prosecutor had failed to disclose information about Peak that could have been used to impeach him. The district court denied the motion. Branigh appeals, challenging the aforementioned district court rulings and contending that the prosecutor committed misconduct by stating facts not in evidence during his closing argument and by failing to correct Peak's allegedly perjured testimony.

## II.

## ANALYSIS

### A.     Motion to Suppress the Sprint Cell Phone Records

Branigh's suppression motion asserted that the State's acquisition of his cell phone records from Sprint violated safeguards afforded by the Fourth Amendment to the United States Constitution and Article I, § 17 of the Idaho Constitution. Both the Fourth Amendment and Article I, § 17 prohibit unreasonable searches and seizures by the government. A search that is conducted without a warrant is unreasonable per se unless it falls within one of the well-defined exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443,454-55 (1971); *State v. Simmons*, 120 Idaho 672, 676, 818 P.2d 787, 791 (Ct. App. 1991).

Branigh argued to the district court that the Sprint records were illegally obtained because Idaho law enforcement officers had no authority to serve and execute a search warrant at Sprint's headquarters in Kansas. The district court initially granted the motion.[1] The court held that Branigh had established a constitutionally-protected privacy interest in the records because of Sprint's privacy policy and that the search warrant was unlawfully executed in violation of Idaho Criminal Rule 41(a) as then in effect. The State filed a motion to reconsider, asserting that the Federal Stored Communications Act, 18 U.S.C. § 2701, *et seq.* authorized nationwide service of the Idaho warrant. On reconsideration, the district court agreed that the federal statute

---

[1]     The court also noted that its ruling did not foreclose admission of Branigh's text messages and cell phone records if the State could show that they were lawfully obtained by some means other than the challenged warrant.

3

authorized the out-of-state service of the warrant and therefore reversed its earlier ruling on the suppression motion.

On appeal, Branigh abandons his argument below that the warrant was illegally served or executed by the officer and now argues that by issuing a warrant to obtain the records located in Kansas, the magistrate court exceeded its authority under I.C.R. 41(a). At the pertinent time, that rule authorized the issuance of a search warrant "by a district judge or magistrate within the judicial district wherein the property or person sought is located . . . ." Branigh contends that because the records sought were not within the magistrate's judicial district, the magistrate court was "without jurisdiction" to issue it. Branigh reasons that the warrant was therefore void and the subsequent search was effectively conducted without a warrant and was *ipso facto* violative of both Article I, § 17 of the Idaho Constitution and the Fourth Amendment. Although this question of the magistrate's jurisdiction to issue the warrant is not an issue that was raised by Branigh below, because he presents it as a challenge to the magistrate court's subject matter jurisdiction and because the district court raised the application of I.C.R. 41(a), we will address the issue on appeal. *See State v. Lundquist*, 134 Idaho 831, 835, 11 P.3d 27, 31 (2000); *State v. Peterson*, 153 Idaho 157, 160, 280 P.3d 184, 187 (Ct. App. 2012); *State v. Diggie*, 140 Idaho 238, 240, 91 P.3d 1142, 1144 (Ct. App. 2004).

### 1. Privacy interest

We begin with the State's contention on appeal that Branigh lacks standing to seek suppression because he had no reasonable expectation of privacy in the records stored by his service provider, Sprint. The Fourth Amendment and Article I, § 17 prohibitions against unreasonable searches are not implicated unless the person invoking their protection had a "justifiable," "reasonable," or "legitimate expectation of privacy" that was invaded by the government action. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *State v. Thompson*, 114 Idaho 746, 749, 760 P.2d 1162, 1165 (1988). *See also Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *Katz v. United States*, 389 U.S. 347, 357 (1967); *State v. Wright*, 153 Idaho 478, 489, 283 P.3d 795, 806 (Ct. App. 2012). A defendant attempting to suppress evidence bears the burden to show such a privacy interest and, thus, "standing" to challenge a search. *State v. Holland*, 135

Idaho 159, 162, 15 P.3d 1167, 1170 (2000); *State v. Bottelson*, 102 Idaho 90, 92, 625 P.2d 1093, 1095 (1981).[2]

Branigh's Sprint records at issue here consist of two components: a log of telephone numbers to and from which Branigh sent or received calls or texts, and the content of text messages between Branigh and Anderson, and between Branigh and Johnston, from days before the shooting until shortly thereafter. These two components are subject to differing privacy concerns, and the state and the federal constitutions may diverge on whether a privacy interest exists as to the telephone log.

As to that component of the Sprint records that shows only telephone numbers from which Branigh made and received communications, it appears that Branigh has no privacy interest protected by the Fourth Amendment in view of the United States Supreme Court's decisions in *United States v. Miller*, 425 U.S. 435 (1976), and *Smith*, 442 U.S. 735. In *Miller*, the Supreme Court held that the defendant had no expectation of privacy in his bank's business records of his deposits and, therefore, no interest protected by the Fourth Amendment. The Court stated:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

*Miller*, 425 U.S. at 443 (citations omitted). In *Smith*, the police, acting without a warrant, had installed a "pen register" that recorded all telephone numbers dialed on the defendant's telephone. The Supreme Court, relying on *Miller* and its progenitors, concluded that:

> [P]etitioner can claim no legitimate expectation of privacy here. When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed.
> . . . .
> We therefore conclude that petitioner in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and that, even if he did, his expectation was not "legitimate."

---

[2] Branigh contends that this Court should not address the State's argument because the State did not raise it before the district court. The record shows, however, that the State *did* raise the issue in its motion for reconsideration.

*Smith*, 442 U.S. at 745. Therefore, the Court held, the Fourth Amendment was not implicated and no warrant was required.

In interpreting Article I, § 17 of the Idaho Constitution, however, the Idaho Supreme Court reached a different conclusion. It held that a telephone customer does possess a protected privacy interest in such telephone logs. In *Thompson*, 114 Idaho at 749, 760 P.2d at 1165, the Supreme Court rejected the reasoning in *Smith* and held that Article I, § 17 of the Idaho Constitution afforded greater protection to such information than did the Fourth Amendment. The Court said that "there is a legitimate and reasonable expectation of privacy in the phone numbers that are dialed." We therefore hold that Branigh had a reasonable expectation of privacy in the telephone log records that the State obtained from Sprint and that the State's acquisition of those logs was subject to the restraints of Article I, § 17.

As to the portion of the Sprint records consisting of text messages, whether there is a privacy interest protected by the Fourth Amendment is not settled. In *City of Ontario, Cal. v. Quon*, ___ U.S. ___, 130 S. Ct. 2619 (2010), the issue was presented but the United States Supreme Court did not resolve it. Instead, the Court assumed that Quon had a reasonable expectation of privacy in his text messages, but held that the Fourth Amendment "special needs" exception to the warrant requirement applied in that case. *Id.* at ___-___, 130 S. Ct. at 2630-33. A few jurisdictions, both before and after *Quon*, have found a protected Fourth Amendment privacy interest in text messages and email messages. In *State v. Bone*, 107 So. 3d 49, 63-67 (La. Ct. App. 2012), the court held that the defendant had a reasonable expectation of privacy in the content of his text messages stored by his service provider. The Court in *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010), likewise held that a subscriber enjoys a reasonable expectation of privacy in the content of emails that are stored or sent and received through a third-party Internet service provider. In *United States v. Forrester*, 512 F.3d 500, 509-12 (9th Cir. 2008), the Ninth Circuit Court of Appeals held that a computer user has no legitimate expectation of privacy in the to/from addresses on his email messages as shown on his home computer because that information is conveyed to his service provider, but the Court in dicta noted that the content of the emails "may deserve Fourth Amendment protection." Several other cases have held that people have an expectation of privacy in the content stored on their cell phones, including text messages. *See United States v. Zavala*, 541 F.3d 562, 577 (5th Cir. 2008);

6

*United States v. Finley*, 477 F.3d 250, 259 (5th Cir. 2007); *United States v. Quintana*, 594 F. Supp. 2d 1291, 1299 (M.D. Fla. 2009); *United States v. Davis*, 787 F. Supp. 2d 1165, 1170 (D. Or. 2011).

It is unnecessary for this Court to join the debate as to whether a privacy interest protected by the Fourth Amendment exists in text messages stored by a service provider because, in view of the Idaho Supreme Court's *Thompson* decision, a privacy interest plainly must be recognized under the Idaho Constitution. If, as *Thompson* holds, there is a privacy interest protected by the Idaho Constitution in a telephone contact log, by logical extension there also must be a protected privacy interest in the content of text messages, for messages disclose far more intimate and private information than a mere list of numbers dialed. We so hold.

**2.        Whether the warrant's noncompliance with I.C.R. 41 requires suppression**

The next question is whether the magistrate court's warrant that purported to authorize a search outside of the magistrate's judicial district, indeed outside of the state boundaries, satisfied Article I, § 17 of the Idaho Constitution.[3]  Branigh asserts that the warrant was void because it was issued in excess of the magistrate's jurisdiction in that the property searched was in Kansas. He bases this argument on former Idaho Criminal Rule 41(a), which then stated:

> **(a) Authority to Issue Warrant.**  A search warrant authorized by this rule or by the Idaho Code may be issued by a district judge or magistrate *within the judicial district wherein the property or person sought is located* upon request of a law enforcement officer or any attorney for the state of Idaho.

(emphasis added).

Judicial actions taken without subject matter jurisdiction are void. *See generally State v. Lute*, 150 Idaho 837, 840, 252 P.3d 1255, 1258 (2011); *State v. Dicksen*, 152 Idaho 70, 76, 266 P.3d 1175, 1181 (Ct. App. 2011); *State v. Armstrong*, 146 Idaho 372, 376, 195 P.3d 731, 735 (Ct. App. 2008). Idaho jurisprudence addressing subject matter jurisdiction has generally dealt with challenges to a court's jurisdiction over a *case*, asserting either that the court never acquired subject matter jurisdiction in the first instance or that the court lost it after a final judgment concluded the case. *See, e.g.*, *State v. Jones*, 140 Idaho 755, 757-58, 101 P.3d 699, 701-02

---

[3]      That section states: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized."

7

(2004) (holding an Idaho court possesses subject matter jurisdiction in the criminal context when a charging document has been filed alleging the commission of an offense, as defined under Idaho law, that was committed within the state of Idaho); *State v. Jakoski*, 139 Idaho 352, 355, 79 P.3d 711, 714 (2003) (the district court no longer had jurisdiction to hear a motion to withdraw the defendant's guilty plea after the case became final). As described by our Supreme Court:

> Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind or character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some of the inherent facts that exist and may be developed during trial.

*Troupis v. Summer*, 148 Idaho 77, 79-80, 218 P.3d 1138, 1140-41 (2009) (quoting *Richardson v. Ruddy*, 15 Idaho 488, 494-95, 98 P. 842, 844 (1908)). *See also Alpine Vill. Co. v. City of McCall*, ___ Idaho ___, ___, ___ P.3d ___, ___ (June 14, 2013). The Idaho Supreme Court "has adopted a presumption that courts of general jurisdiction have subject matter jurisdiction unless a party can show otherwise." *Id.*; *Borah v. McCandless*, 147 Idaho 73, 78, 205 P.3d 1209, 1214 (2009).

No constitutional provision or statute imposes territorial limits on the power of Idaho courts to issue warrants. Article V, § 20 of the Idaho Constitution states that "[t]he district court shall have original jurisdiction in all cases, both at law and in equity, and such appellate jurisdiction as may be conferred by law." The legislature has statutorily created a magistrate division of the district court. I.C. § 1-2201. Both district and magistrate courts are courts of general jurisdiction in this state. *See generally In re Hanson*, 121 Idaho 507, 510-11, 826 P.2d 468, 471-72 (1992). Idaho Code § 19-301(1) states that for criminal prosecutions, "evidence that a prosecutable act was committed within the state of Idaho is a jurisdictional requisite." Idaho Code § 19-4406 authorizes magistrates to issue search warrants upon a showing of probable cause.

The only authority we have found that imposed a territorial limit for warrants issued by Idaho courts is former I.C.R. 41(a). We conclude that this rule was not a limit on a court's subject matter jurisdiction, but a voluntary restraint on a state court's authority that was judicially imposed by the Idaho Supreme Court through adoption of the rule. It is noteworthy

8

that in 2012 the rule was amended to expressly authorize warrants for property located outside the territorial boundaries of the state.[4] Therefore, the Idaho Supreme Court apparently is not of the view that such warrants are inherently beyond the jurisdiction of Idaho courts. We hold that the magistrate here had subject matter jurisdiction to issue the warrant. Although the warrant was issued in violation of limitations placed on the magistrate's authority by former I.C.R. 41(a), this was merely a judicial error, not an act taken without subject matter jurisdiction.

Branigh also appears to argue that the violation of Rule 41(a) calls for suppression of the Sprint records regardless of whether the rule's territorial limitation is jurisdictional. We find this argument to be without merit because the exclusionary rule requires suppression of evidence only when *constitutional* restraints on searches or seizures have been violated. Decisions of both the United States Supreme Court and the Idaho Supreme Court establish that the violation of state statutes in the conduct of a search or arrest does not justify suppression so long as constitutional standards are met.

In *Virginia v. Moore*, 553 U.S. 164 (2008), a defendant who was arrested for a misdemeanor driving offense and was searched incident to arrest argued that resulting evidence must be suppressed because under state law the misdemeanor was not an arrestable offense. The Supreme Court held that although the arrest was unlawful under state law, suppression was not warranted because the existence of probable cause for the arrest satisfied the Fourth Amendment. *Moore*, 553 U.S. at 171-72. Similarly, in *Dalia v. United States*, 441 U.S. 238 (1979), the Supreme Court rejected a contention that if a court order authorizing surveillance did not authorize a covert entry to facilitate that surveillance, the entry violated the subject's Fourth Amendment privacy rights. The Court said:

> The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly

---

[4] Currently, the rule states:

> **(a) Authority to Issue Warrant.** A search warrant authorized by this rule or by the Idaho Code may be issued by a district judge or magistrate within the judicial district *wherein the county of proper venue* is located upon request of a law enforcement officer or any attorney for the state of Idaho. *Where it does not appear that the property or person sought is currently within the territorial boundaries of the state of Idaho, such warrant may still be issued; however, no such issuance will be deemed as granting authority to serve said warrant outside the territorial boundaries of the State.*

9

describing the place to be searched, and the persons or things to be seized." Finding these words to be "precise and clear," *Stanford v. Texas*, 379 U.S. 476, 481, 85 S. Ct. 506, 509, 13 L. Ed. 2d 431 (1965), this Court has interpreted them to require only three things. First, warrants must be issued by neutral, disinterested magistrates. See*, e g.*, *Connally v. Georgia*, 429 U.S. 245, 250-251, 97 S. Ct. 546, 548-549, 50 L. Ed. 2d 444 (1977) (*per curiam*); *Shadwick v. Tampa*, 407 U.S. 345, 350, 92 S. Ct. 2119, 2122, 32 L. Ed. 2d 783 (1972); *Coolidge v. New Hampshire*, 403 U.S. 443, 459–460, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971). Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. *Warden v. Hayden*, 387 U.S. 294, 307, 87 S. Ct. 1642, 1650, 18 L. Ed. 2d 782 (1967). Finally, "warrants must particularly describe the 'things to be seized,' " as well as the place to be searched. *Stanford v. Texas, supra*, at 485, 85 S. Ct. at 511.

. . . .

Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant--subject of course to the general Fourth Amendment protection "against unreasonable searches and seizures."

*Dalia*, 441 U.S. at 255-57.

More directly addressing the type of rule at issue here, is *United States v. Berkos*, 543 F.3d 392 (7th Cir. 2008), which considered whether a federal magistrate judge could properly issue a search warrant for the production of electronic evidence where the warrant was directed to an Internet service provider located in another state. The court was required to determine whether the issuing magistrate's violation of Federal Rule of Criminal Procedure 41(b), which authorized magistrates to issue warrants only in the district where the warrant was to be executed, rendered the warrant invalid and merited invoking the exclusionary rule. The Court said:

This Court has held that "violations of federal rules do not justify the exclusion of evidence that has been seized on the basis of probable cause and with advance judicial approval." *United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008); *United States v. Trost*, 152 F.3d 715, 722 (7th Cir. 1998). The remedy of allowing a defendant to go free based on a violation of Rule 41's requirements for obtaining a proper search warrant would be "wildly out of proportion to the wrong." *Cazares-Olivas*, 515 F.3d at 730. This alone merits affirming the district court's denial of Berkos's first motion to suppress.

*Berkos*, 543 F.3d at 396.

Idaho Supreme Court authority comports with the foregoing federal court decisions. For example, in *State v. Benefiel*, 131 Idaho 226, 229, 953 P.2d 976, 979 (1998), a Bureau of Indian Affairs officer stopped a vehicle driving on a state highway, which was outside the officer's territorial jurisdiction. The driver was eventually arrested for DUI, and he moved to suppress evidence resulting from the stop. Our Supreme Court concluded that suppression was not warranted because the stop was supported by reasonable suspicion, and thus no constitutional violation had occurred. The Court did not deem the jurisdictional issue to merit suppression, or even much mention.

In *State v. Bicknell*, 140 Idaho 201, 91 P.3d 1105 (2004), a Rathdrum police officer appeared before a magistrate judge seeking a search warrant for evidence related to an automobile theft. The officer presented to the magistrate the affidavit of a Washington State Patrol Detective that had been notarized by an Idaho notary public. The affidavit did not comply with Idaho Criminal Rule 41(c), which provided, "A warrant shall issue only on an affidavit or affidavits sworn to before a district judge or magistrate or by testimony under oath and recorded and establishing the grounds for issuing a warrant." The district court had construed the phrase "sworn to before a district judge or magistrate" as requiring that the affiant appear personally before the district judge or magistrate and execute the affidavit in the judge's presence. The Idaho Supreme Court said that there was no showing that the procedure to obtain the search warrant violated either the state or federal constitution. The Court continued:

> Each time the exclusionary rule is applied it exacts a substantial social cost because relevant and reliable evidence is kept from the trier of fact, the search for truth at trial is deflected, and persons who would otherwise be incarcerated are allowed to escape the consequences of their actions.
>
>         . . . .
>         The Defendants in these cases have not shown how the alleged procedural error in the issuance of the search warrant here in any way impacted any of their substantive rights. Therefore, such error affords no basis for suppressing the evidence obtained during the search pursuant to the warrant. The exclusionary rule was not created as a remedy for errors in following procedures, whether imposed by rule or statute, that were not designed to implement or protect constitutional rights.

*Bicknell*, 140 Idaho at 204-05, 91 P.3d at 1108-09.

11

In *State v. Zueger*, 143 Idaho 647, 650, 152 P.3d 8, 11 (2006), a warrant was issued in violation of I.C. § 19-4406, which limits those who may sign a magistrate judge's name to a warrant to the magistrate himself/herself or an authorized peace officer. The magistrate had authorized a prosecutor to sign the magistrate's name to a warrant. The Idaho Supreme Court held that this error did not constitute a constitutional violation, stating:

> In order to rise to the level of a constitutional violation, there must be a defect which calls into question the Constitution's requirement of a finding of probable cause to justify issuance of the warrant. Article I, section 17 of the Idaho Constitution provides that 'no warrant shall issue without a finding of probable cause . . . .' [A] mere procedural error, which does not implicate the defendant's constitutionally protected rights, should not serve to invalidate the otherwise properly issued warrant. . . .
>
> In the present case, the magistrate stated on the record her finding of probable cause, clearly indicated that she intended to issue a warrant, and specifically directed the prosecuting attorney to sign the warrant on her behalf. Zueger has alleged no due process violation arising from the prosecutor's signature on the warrant, and the Court finds none.

*See also State v. Koivu*, 152 Idaho 511, 518, 272 P.3d 483, 490 (2012) ("The exclusionary rule is a judicially created remedy for searches and seizures that violate the Constitution."); *State v. Skurlock*, 150 Idaho 404, 405-07, 247 P.3d 631, 632-34 (2011) (where a nighttime search was conducted, allegedly in violation of I.C. § 19-4411 and I.C.R. 41(c), which required that search warrants be served in the daytime unless otherwise specifically authorized by the magistrate, suppression was not warranted because no constitutional violation was shown).

The only contrary Idaho authority we have found is *State v. Card*, 137 Idaho 182, 45 P.3d 838 (2002), where the defendant asserted that a search warrant was unlawfully executed because statutes required that search warrants be executed by the peace officers named in the warrant. Although the Caldwell police officers named in the search warrants were present for the service of the warrants, they "played an extremely passive role in the execution of the warrant," which was done mostly by Tax Commission authorities. The Court majority[5] concluded that suppression was required because this violation of the statutes rendered the search unreasonable. *Id.* at 187, 45 P.3d at 843. As illustrated above, however, subsequent Idaho Supreme Court cases uniformly hold that suppression is required only for constitutional

---

[5]     One justice dissented, opining that suppression was not warranted because the constitution was not violated.

violations. In those more recent cases, *Card* has never been cited or discussed, but it appears to have been abrogated by later decisions.

An additional case which could be viewed as requiring suppression for a statutory violation is *State v. Mathews*, 129 Idaho 865, 934 P.2d 931 (1997), where a warrant that was inadvertently left unsigned by the approving magistrate was served and executed in violation of Idaho statutes. Although the resident whose home was being searched examined the warrant, pointed out to the officers that it was unsigned, and objected to the search, the officers nevertheless conducted the search with knowledge of the defect in the warrant. The Idaho Supreme Court held that this omission required suppression of the evidence. *Id.* at 869, 934 P.2d at 935. Although *Mathews* could be viewed as requiring suppression for violation of the statutory requirement that the issuing judge signed a warrant, in a subsequent decision the Idaho Supreme Court took pains to stress that the violation in *Mathews* was constitutional in character. In *Bicknel*, our Supreme Court described its holding in *Mathews* as follows:

> The *Mathews* Court held invalid a search warrant that had not been signed. The majority did not base their opinion simply upon statutory requirements that the search warrant be signed, but upon a "substantive right in a citizen to refuse to permit a search pursuant to an unsigned warrant" that was "affirmed by Article XXI, Section 2 of the Idaho Constitution." 129 Idaho at 869, 934 P.2d at 935. The *Mathews* majority also cited Article I, § 17, as establishing a substantive right to a signed search warrant. *Id.* Rather, in both cases the Court held that the error in question also impacted the constitutional rights of the defendant.

*Bicknel*, 140 Idaho at 204, 91 P.3d at 1108.

In summary, the Idaho Supreme Court has instructed that suppression is available as a remedy only where a constitutional right was infringed, and Branigh's argument, predicated on I.C.R. 41(a), does not establish such an infringement. The search warrant in question here was issued upon a justified finding of probable cause by a neutral, detached magistrate. It therefore satisfied Article I, § 17 of the Idaho Constitution. Branigh has not shown that any of his substantive rights were impaired by the defect in the warrant for the production of Sprint's records. The Idaho warrant, though noncompliant with Rule 41(a), created no greater intrusion on Branigh's privacy interests than would have a warrant issued by a court in Kansas, the state

13

where Sprint's offices were located.  Consequently, the magistrate's violation of Rule 41(a) does not require suppression.[6]

### 3.     Error in address of Sprint's premises

Branigh raises one additional constitutional challenge to the warrant that requires discussion, though it does not delay us long.  Both the Fourth Amendment and Article I, § 17 of the Idaho Constitution expressly require that a search warrant "particularly describe" the place to be searched.  Branigh contends that the warrant for Sprint's records failed in particularity because it described Sprint's headquarters as being located in Overland Park, Texas instead of its actual location in Overland Park, Kansas.

Branigh's contention is without merit.  The constitutional particularity standard is satisfied if the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort and if there is no reasonable probability that another location might be mistakenly searched. *United States v. Gitcho*, 601 F.2d 369, 371 (8th Cir. 1979); *State v. Reynolds*, 148 Idaho 66, 69, 218 P.3d 795, 798 (Ct. App. 2009); *State v. Young*, 136 Idaho 711, 714-15, 39 P.3d 651, 654-55 (Ct. App. 2002).  The error in the warrant here created no reasonable probability that the wrong place might be mistakenly "searched."  The warrant described the premises as "Sprint Nextel Corporate Security, Subpoena Compliance, located at 6480 Sprint Parkway in Overland Park, Texas (Fax #913-315-0736)."  The necessary particularity was supplied by the name of the corporate office with control of the records and the fax number.  There was no risk that any location in Texas could have been searched pursuant to this warrant.  The warrant was sent by fax to Sprint's headquarters, wherever its location, and no executing officer needed to or did travel to *any* premises to acquire the Sprint records.  The district court did not err in rejecting this argument.

No constitutional violation having been shown, the district court correctly denied Branigh's motion to suppress the Sprint records acquired through a warrant that was issued in violation of a court rule.

---

[6]     Given this determination, it is unnecessary for this Court to address the State's alternative argument that the search warrant was authorized by the Federal Stored Communications Act.

**B.     Idaho Rule of Evidence 404(b) Objections to Cell Phone Records**

At trial, the State offered into evidence Exhibit 4, a sixty-six page document consisting of text messages exchanged between Branigh and Anderson on the day in question.  The document was created from photographs of the display screen of Anderson's phone, taken by police with her consent.  Branigh objected to the document on a multitude of grounds including foundation, hearsay, relevance, authenticity, best evidence rule, I.R.E. 403, and an assertion that "some of these" messages were inadmissible under I.R.E. 404(b).  The district court sustained the foundation objection, and after further foundation was presented, the State again offered the exhibit into evidence.  Branigh then renewed the objections "I previously listed."   The district court overruled the objections stating, among other things, that "I've also not been cited anything particular [of a] 404(b) nature, so that is also overruled."  Later in the trial, the State offered Exhibit 64, consisting of the sixty pages of telephone records and forty-two pages of text message information from Branigh's cell phone produced by Sprint.  Branigh objected to this exhibit "under 404(b)," and the district court overruled the objection.  On appeal, Branigh contends that his objection to these exhibits based on I.R.E. 404(b) should have been sustained.

Rule 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."  Branigh's broad objection based on this rule encompassed scores of text messages that were both sent and received by Branigh.  Branigh's objection did not specify which text messages he contended constituted evidence of "other crimes, wrongs or acts" offered for the purpose prohibited by Rule 404(b).  Our Supreme Court's recent decision in *Hansen v. Roberts*, 154 Idaho 469, 299 P.3d 781 (2013) addressed an analogous circumstance.  At the outset of an opposing expert's trial testimony, Hansen objected to "all of" the expert's testimony as invading the province of the jury but did not explain how, in his view, the prospective testimony could be so characterized.  The objection was overruled.  On appeal, Hansen provided two specific instances where he contended the expert's testimony crossed the line.  Nonetheless, our Supreme Court declined to address the claims of error, concluding that regardless of their possible merit as explained by Hansen for the first time on appeal, "Hansen's broad, general [trial] objection that [the expert's] testimony invaded the province of the jury is not a proper objection to preserve either of his challenges to [the expert's] testimony."  *Id.* at 474, 299 P.3d at 786.

15

Branigh similarly did not preserve his I.R.E. 404(b) objections for review. One of the purposes of the contemporaneous objection requirement is to give the trial court an opportunity to consider and resolve disputes at the time when the error can be prevented or cured, or any prejudice attendant to an error can be lessened. *State v. Adams*, 147 Idaho 857, 861, 216 P.3d 146, 150 (Ct. App. 2009). Branigh's objection that "some of" Exhibit 4 contained inadmissible Rule 404(b) evidence and his objection "under 404(b)" to Exhibit 64 failed, for lack of particularity, to preserve his appellate challenges to the admissibility of the documents.

Branigh also asserts error in the admission of the documents because at a pretrial hearing the judge ruled that before any "Rule 404(b) evidence" would be admitted, there would be a hearing outside the presence of the jury to determine relevance. This claim of error has no merit because the failure to conduct a hearing was not among Branigh's asserted trial objections and even if it had been, the claim would fail because Branigh did not make an adequate I.R.E. 404(b) objection on either occasion.

## C. Photographs of the Victim's Body

Branigh next contends that the district court erred by admitting into evidence at trial three photographs taken at the emergency room. The photographs show the victim's wounds and a chest-drainage tube inserted during treatment. Branigh objected that the photos should be excluded under I.R.E. 403 because their probative value was substantially outweighed by the risk of unfair prejudice. Branigh argues that because there was no dispute that Johnston was shot in the chest or that the wounds caused his death, the relevance of the photographs "was, at best, minimal and, at worst, nonexistent." He argues that the risk of prejudicial effect was high because "[t]he only effect the photographs would have had was to appeal to the jury's passion by creating sympathy for Mr. Johnston because of the state he was in when the photographs were taken."

Branigh's argument is unpersuasive. The State was required to prove, among other things, that Branigh shot and killed Johnston. The photographs were relevant to prove the manner in which Johnston died, as well as to corroborate and illustrate the testimony of the emergency room physician on this point. Branigh's assertion that he did not dispute these matters at trial does not make the photographs inadmissible as irrelevant. *State v. Reid*, 151 Idaho 80, 87, 253 P.3d 754, 761 (Ct. App. 2011); *State v. Sanchez*, 147 Idaho 521, 526-27, 211 P.3d 130, 135-36 (Ct. App. 2009). Nor do the photos create a risk of unfair prejudice that

16

warrants excluding them. In a murder trial where the defendant appealed the admission of photographs that depicted the victim with her throat cut, the Idaho Supreme Court stated:

> The trial court has the discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the *corpus delecti*, the extent of the injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime. The fact that the photographs depict the actual body of the victim and the wounds inflicted on her and may tend to excite the emotions of the jury is not a basis for excluding them.

*State v. Beam*, 109 Idaho 616, 620-21, 710 P.2d 526, 530-31 (1985). The district court did not err in overruling Branigh's Rule 403 objection.

### D. Prosecutorial Misconduct During Closing Argument

Branigh next asserts that the prosecutor committed misconduct during closing argument by referring to facts not in evidence. On cross-examination, Branigh elicited testimony from a police officer to the effect that, to the officer's knowledge, neither Branigh's person nor his car were tested for gunshot residue evidence and, more specifically, that Branigh's glasses were not tested because "[o]ur state lab doesn't test for gun powder residue." No other evidence regarding gunshot residue was presented. During closing argument the prosecutor asserted, without defense objection, that:

> The Defendant is likely to make a big deal of the fact that there was no gunshot residue testing done. But if you will recall, [the officer] told you the lab doesn't do those anymore. In fact, the FBI doesn't do them anymore because they are not reliable. They don't tend to prove anything. They result in false positive. If you find evidence of gunshot, all that says is that at some time in the past there was a gun fired. You can't identify the gun, when it was anything like that. And so they have taken the position they will no longer do the testing.

In rebuttal argument, the prosecutor, again without defense objection, expanded on this theme:

> Defendant brings up this what he considers very important gunshot residue. He said had they checked him it would have proven beyond a doubt that he hadn't fired a gun. Well, you know, that's why they don't do it anymore because it wouldn't have proven that. He had an hour and 40 minutes from the time of the murder--from the time the chase started during which time he could have washed his hands thoroughly and eliminated any trace of gunshot residue. Or this is--this is really the biggest problem with that. You will recall [the officer] saying that he was one of the individuals involved in the take down of him and he was one of the guys pulling the arm, tried to get out from under the bottom. We know that [the officer] had just fired his AR15 numerous times trying to take the tires out on this car. GSR transfer is one of the biggest problems that makes it

17

unreliable. And in situations where there is [sic] gunshots, it's highly likely there's more than one gun involved. So if they found gunshot residue, it wouldn't have said anything.

There is no way that we could have introduced evidence to say that that was a result of the revolver that he used to kill Michael Johnston any more than it was evidence that it was GSR transfer from all the--well, as a matter of fact, I mean here's a--every officer in every car has got gunshot residue sitting around. I mean it just becomes a mess. Every one of them takes qualifications practice, their guns have it on them. They handle their guns. All of them have their guns drawn at this time. The weapons that are in their car have gunshot residue. It's just--you know, it's just unreliable evidence. So it would not have proven anything for the defendant regardless of what he says.

We agree with Branigh's complaint that, save for the prosecutor's statement to the effect that a police officer had testified that the state lab does not test for gunshot residue, the vast majority of the prosecutor's argument recounts facts not in evidence.

Because Branigh did not object to these comments at trial, we review the issue as a claim of fundamental error. Such a review requires a three-part inquiry in which the defendant bears the burden of persuading the appellate court that the alleged error (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision; and (3) was not harmless. *State v. Perry*, 150 Idaho 209, 228, 245 P.3d 961, 980 (2010); *State v. Felder*, 150 Idaho 269, 272, 245 P.3d 1021, 1024 (Ct. App. 2010).

It constitutes misconduct for a prosecutor to place before the jury facts not in evidence. *Felder*, 150 Idaho at 273-74, 245 P.3d at 1025-26; *State v. Gerardo*, 147 Idaho 22, 26, 205 P.3d 671, 675 (Ct. App. 2009); *State v. Phillips*, 144 Idaho 82, 86, 156 P.3d 583, 587 (Ct. App. 2007). Branigh has thus satisfied the first prong of the fundamental error inquiry because "[w]here a prosecutor attempts to secure a verdict on any factor other than the law as set forth in the jury instructions and the evidence admitted during trial, including reasonable inferences that may be drawn from that evidence, this impacts a defendant's Fourteenth Amendment right to a fair trial," and hence is reviewable as fundamental error. *Perry*, 150 Idaho at 227, 245 P.3d at 979. *See also State v. Frauenberger*, 154 Idaho 294, 303, 297 P.3d 257, 266 (Ct. App. 2013). Branigh has also shown that the error plainly exists. We conclude, however, that because of overwhelming

18

evidence of Branigh's guilt, Branigh has not met his burden to show that the misconduct was not harmless.

At trial, the State called fourteen witnesses. Among them was a woman who lived in the house at the intersection where the shooting occurred. She testified she had gone outside to retrieve items from her car trunk, noticed a white car idling at the intersection, heard a male voice, then heard a gunshot and saw a corresponding flash of light inside the white car. As she crouched on the ground, she heard four to five more gunshots, heard a male voice say "Oh shit, man," and then watched the white car slowly drive away. During her testimony, the witness looked at several pictures of Branigh's vehicle and identified it as the same or similar to the white car that she saw when the shots were fired.

Another witness was a man delivering a trailer in the area where the shooting occurred. He noticed a white Camaro with its headlights on sitting off the side of the road ahead of and facing him. Because he was concerned about what the driver was doing, he slowed down to around 15 miles per hour. He then heard several pops he believed to be gunshots. Immediately after the gunshots stopped, the white Camaro pulled over into its lane and drove away at a normal rate of speed. The witness looked around as he drove by but, when he saw nothing of concern, he continued on. On his return a short time later, he saw emergency vehicles, so he stopped and told the police what he had seen. The witness said that, being a bit of a car buff, he noted that the white car was an early 1980s IROC Camaro with a dent in the driver's right front fender. After looking at pictures of Branigh's Camaro during his testimony at trial, the witness said the car he saw was either the same car or an identical car.

A third witness testified he was watching TV with his wife when he heard one or two gunshots. As he hurried to his window to look outside, he heard four or five more shots and saw flashes of light reflecting off a nearby house. He then ran downstairs to his door where he found Michael Johnston standing on his porch holding his chest. Johnston told the witness he had been shot by a man in a white car.

In addition to witnesses that were in the area at the time of the shooting, the State called two witnesses who testified to seeing a white Camaro near the area of the shooting a few hours prior to the homicide. Both described the vehicle as being driven erratically or recklessly, both identified a picture of Branigh's vehicle as being the same or similar to the one they had seen in the area, and one witness identified Branigh as the driver of the white Camaro.

19

The State also presented evidence about a high-speed chase by police as they attempted to take Branigh into custody that same night. Branigh quickly became a suspect in the shooting, and a description of his vehicle was broadcast to police. The vehicle was soon observed by a police officer in Clarkston, Washington who attempted to stop him. However, Branigh drove out of Clarkston and into Lewiston at a high rate of speed, where Nez Perce County deputies and Lewiston police officers took up the pursuit. Even after the chase had ended, Branigh continued to resist the officers.

Perhaps the most damning of all the evidence against Branigh was the text messages he sent to victim Michael Johnston and Johnston's ex-wife, Anderson. These included ominous messages to Anderson sent on the afternoon and evening preceding the shooting, which occurred at approximately 10:20 p.m. The following is a sampling of the messages Branigh sent Anderson.

2:38 p.m.: talk 2 me or this will get bad. aint it fun. u a working woman still

3:32 p.m.: talk to me face 2 face like the strong woman u r and stop being scared

3:35 p.m.: im tryn 2 help u and u call cops on me.[7] i love u and cant take this shit anymore. talk 2 me

5:45 p.m.: I WILL BE FREE

6:20 p.m.: FUK IT THEN COPS OR NO COPS

6:21 p.m.: IM READY 2 DIE

6:43 p.m.: I love u talk 2 me please im trying 2 stay out of trouble

6:57 p.m.: please help me. i can only help so much

7:24 p.m.: im not scared of mk or an of his fam

7:28 p.m.: fuk it im not afraid 2 die

7:55 p.m.: u got ur kids out of there? this is gonna b a mess

8:39 p.m.: my life is yours. if u really want me 2 sacrifice myself and let u have whats left, then I will. sorry it took so long. i love u my beautiful"

8:53 p.m.: i dont care about dead bodies in old graves, ill fight till I win or die

9:02 p.m.: good bye heart of my heart

9:20 p.m.: mks done u wont talk 2 me, so I swear it on ur kids' lives, mks done

9:23 p.m.: u don't talk 2 me and I promise u i will take this all the way

---

[7]     This portion of the text apparently refers to the incident that occurred during the afternoon before the shooting when Branigh appeared at the residence shared by Anderson and Johnston and refused to leave until police arrived.

The following messages appear to have been sent at a point soon after Johnston was shot:

9:34 p.m.: all u had 2 do was talk 2 me. c u in a few

9:36 p.m.: Games r what uv always bleevd. Death is an honor. U wont b touched by this. I WILL BE FREE.

9:37 p.m.: c u in a few

10:09 p.m.: all u had 2 do was talk 2 me

Branigh also exchanged text messages with the victim, Michael Johnston, until moments before Johnston was killed, as follows:

8:58 p.m. - Johnston: She dont want 2 talk or c u so give it up

8:59 p.m. - Branigh: bye mikey

8:59 p.m. - Johnston: I dont control her

9:00 p.m. - Branigh: bye mikey

9:07 p.m. - Johnston: Who u with tough guy

9:07 p.m. - Branigh: me

9:08 p.m. - Johnston: I dont control her

9:09 p.m. - Branigh: not anymore

9:12 p.m. - Branigh: where u at little sister

9:13 p.m. - Johnston: Home dumbass

9:14 p.m. - Branigh: hidn behind ur family and the cops still coward

9:16 p.m. - Branigh: bring urfukn punk ass out of there

9:17 p.m. - Branigh: come on with ur stupid ass

9:18 p.m. - Johnston: Ive been outside 4 almost an hour

. . . .

9:23 p.m. - Branigh: bring ur punk fukn ass out of there u fukn coward

. . . .

9:29 p.m. - Johnston: Now im done w txt

9:31 p.m. - Branigh: ur a coward come out of the trailer park. ur kids will never b harmd by me.

9:49 p.m. - Johnston: lm out of there

10:10 p.m. - Branigh: where

10:10 p.m. - Branigh: waha

10:10 p.m. - Johnston: Drive by and see

10:14 p.m. - Branigh: come on

21

10:15 p.m. - Branigh:  u know where 2 go coward

10:17 p.m. - Branigh:  u comin

10:19 p.m. - Branigh:  u comin

The 911 phone calls reporting the shooting establish that it occurred just after Branigh sent the last text message to Johnston at 10:19 p.m.  The messages show Branigh threatening Johnston, and they place Branigh outside of Johnston's trailer taunting him to come out for a confrontation immediately before Johnston was shot.  The text messages all but definitively establish that Branigh was the killer, and this conclusion was bolstered by the eyewitness testimony describing Branigh's car as identical to the one from which the shots were fired.  Given the magnitude of the evidence of Branigh's guilt, we can confidently conclude that the prosecutorial misconduct in closing argument did not contribute to the verdict but, rather, was harmless error.

**E.     New Trial Motion**

Following his conviction, Branigh filed a motion for a new trial under I.C. § 19-2406(7) based upon newly discovered evidence concerning Stephen Peak, the jailhouse informant who testified for the State at trial.  Peak had testified to a number of incriminating statements allegedly made by Branigh while the two were housed together in jail.  According to Branigh's motion for a new trial, after the jury's verdict he became aware of new information concerning Peak's relationship with former Nez Perce County Sheriff Jim Dorion.  Through post-trial discovery allowed by the district court, it was revealed that about a year before Branigh's trial, and while Peak and Branigh were jailed together, Nez Perce County Prosecutor Dan Spickler (who also personally handled this case) requested a meeting with an FBI agent and a representative from the Idaho State Police.  At that meeting, Spickler inquired whether Dorion, who at that time was still the sheriff, was under investigation.  The state and federal law enforcement agents confirmed that he was.  Spickler then reported to those agents that a number of sheriff's deputies and others had expressed to him their concern about Dorion's "close personal relationship" with Peak, that Dorion had allowed Peak personal access to a law enforcement computer database containing information about current and past criminal cases, and that Dorion was otherwise providing criminal investigation information directly to Peak.

22

Spickler was asked to contact the State Attorney General about prosecuting Dorion[8] but to otherwise keep the existence of the investigation confidential because it was in its preliminary stages.

Despite his knowledge of Peak's close relationship with the sheriff and alleged communications between Peak and the sheriff specifically about Branigh's case, prosecutor Spickler called Peak as a witness at Branigh's trial and did not disclose any of the above information to the defense. In Branigh's motion for a new trial, he contended that the prosecutor had concealed material impeachment information in violation of his duty under *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963), and thereby deprived Branigh of due process. Spickler opposed the motion, contending that he had no duty to disclose to the defense "mere rumors." The district court disagreed, finding that the evidence was significant for purposes of impeaching Peak's testimony and that the prosecutor had wrongfully suppressed it. The court nevertheless denied Branigh's motion for a new trial on the ground that even if Peak had been thoroughly discredited, or if all of Peak's testimony were disregarded, the evidence of Branigh's guilt was so overwhelming that the jury's verdict would have been the same.

Branigh argues on appeal that the district court improperly applied to his motion state law standards for entitlement to a new trial for newly discovered evidence articulated in *State v. Drapeau*, 97 Idaho 685, 691, 551 P.2d 972, 978 (1976), instead of the more liberal standard established set by the United States Supreme Court in *Brady*.

In *Brady*, the Court held that the prosecution's failure to disclose evidence favorable to an accused upon request violates the defendant's right to due process if the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87. Subsequently, the Supreme Court expanded this duty of disclosure to include an obligation to disclose exculpatory evidence even if was not encompassed within any discovery request by the defense or was requested only in a general way. *United States v. Bagley*, 473 U.S. 667, 682-83 (1985). The duty applies to evidence that is favorable to the accused because it is either exculpatory or impeaching. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Bagley*, 473 U.S. at 676. Such evidence is material "if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding

---

[8] Dorion was later removed from office and tried and convicted for being an accessory to burglary.

would have been different." *Strickler*, 527 U.S. at 280; *Kyles v. Whitley*, 514 U.S 419, 433 (1995); *Bagley*, 473 U.S. at 682. A "reasonable probability" of a different result is shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 678.

Quite distinct from a *Brady* claim, under Idaho Code § 19-2406(7) a convicted defendant may request a new trial based upon newly discovered evidence. To prevail on such a request, the defendant must demonstrate:

> (1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was not due to a lack of diligence on the part of the defendant.

*Drapeau*, 97 Idaho at 691, 551 P.2d at 978. *See also State v. Ellington*, 151 Idaho 53, 72, 253 P.3d 727, 746 (2011). As Branigh points out, the standards for relief on a *Brady* claim for a prosecutor's withholding of exculpatory evidence is less stringent than the *Drapeau* standard for a new trial based on newly discovered evidence. Under *Drapeau*, the defendant must show that the evidence "will probably produce an acquittal" while under *Brady* the defendant's burden is satisfied by showing a reasonable probability of a different verdict in that the government's suppression of evidence "undermines confidence in the outcome of the trial." The latter is a lesser burden. In its written decision, the district court here considered and applied the *Drapeau* test, but it should not have considered that test at all because the basis for the motion was a *Brady* violation. Therefore, we must evaluate whether Branigh's motion should have been granted by applying the correct test.

For a *Brady* analysis, three components must be shown: the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; that evidence was suppressed by the State, either willfully or inadvertently; and that the evidence was material because there is a reasonable probability that its disclosure to the defense would have led to a different result. As to the first prong, the evidence was favorable to Branigh because it could have been used to impeach Peak. Specifically, Peak testified to statements about Johnston's murder and ensuing events allegedly made by Branigh. Had Branigh known that Peak may have acquired that information about the case from police computers or directly from former sheriff Dorion, Peak's credibility could have been undermined on cross-examination. The second *Brady*

24

prong is also satisfied because this information was withheld by the prosecution from the defense.

However, the third prong--showing a reasonable probability of a different result had the suppressed evidence been disclosed--has not been met. Given the compelling nature of the State's evidence of Branigh's guilt as summarized above, we perceive no possibility that the verdict would have been different if the improperly withheld evidence had been available to Branigh to use in impeaching Peak. The withholding of that evidence, although a violation of the prosecutor's duty, does not undermine our confidence in the outcome of the trial.

## F.     Use of Perjured Testimony

As an additional theory for relief, Branigh argues the new evidence about the relationship between Peak and Sheriff Dorion shows that the prosecutor obtained his conviction through perjured testimony because while Peak testified at trial that he was "acquainted" with Dorion, the newly discovered evidence showed that his relationship with the former sheriff was much more than mere acquaintance. When a prosecutor knowingly uses false evidence to obtain a conviction, a stricter materiality standard applies than that employed where the prosecution has failed to disclose exculpatory evidence. *See also United States v. Agurs*, 427 U.S. 97, 103-04 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A stricter standard is employed because the use of false evidence involves "a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Bagley*, 473 U.S. at 678; *Agurs*, 427 U.S. at 103.

Branigh argues that Peak's understatement of the nature of his relationship with Sheriff Dorion constitutes perjury that was knowingly used by the State and that, under the applicable standard for relief, he is entitled to a new trial. Branigh posits this as a claim of fundamental error. Assuming *arguendo* that fundamental error may be predicated upon facts that are not apparent from the record of the proceeding in which the error allegedly occurred (in this case, Branigh's trial), but developed after that proceeding, we find no fundamental error here because the third prong of a fundamental error analysis--a showing that the error was not harmless--is not met here. Even viewing Peak's testimony that he was merely "acquainted" with Sheriff Dorion to be perjurious, we conclude the State's use of the perjured testimony was harmless beyond a

25

reasonable doubt in light of the overwhelming evidence of Branigh's guilt as outlined above. The probative value of Peak's testimony was slight in comparison to the other evidence presented by the State. Even if Peak had never testified, the remaining evidence would have led any reasonable juror to find Branigh guilty of the murder of Michael Johnston. Therefore, Branigh has shown no right to relief on this claim of fundamental error.

In view of this disposition, we do not need to address Branigh's additional argument that the district court should have applied the standard for relief established in *State v. Scroggins*, 110 Idaho 380, 385, 716 P.2d 1152, 1157 (1985), to determine a right to relief when a government witness has recanted his testimony.

## III.

## CONCLUSION

Branigh has not shown error in the denial of his motion to suppress evidence or in the district court's evidentiary rulings at trial. Although he has demonstrated prosecutorial misconduct during closing argument and has shown that the prosecutor improperly withheld exculpatory evidence from Branigh, this misconduct was harmless error because the evidence of Branigh's guilt was so compelling that we are confident the result of the trial would have been the same had the misconduct not occurred. Even if the State can be deemed to have relied upon perjured testimony by one witness, this misconduct was harmless beyond a reasonable doubt. Therefore, the judgment of conviction is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**